# Richmond.

## Watson v. Commonwealth.

### April 2d, 1891.

1. Venire Facias--*Record.*—It need not appear affirmatively on the record that a *venire facias* for summoning a grand jury was ever issued in a case.

2. Testimony— *Cross-examination of accused.*—At a murder trial, accused, on witness stand, admits the homicide and claims he committed it on account of deceased's insult to his wife, and on cross-examination he was asked if she was his lawful wife: *held,* the cross examination was proper, and a valuable test of truth.

3. Instructions—*Degree of crime.*—An instruction to the effect that if accused, in heat of passion, caused by insult to his wife, and before lapse of time enough for his passion to cool, killed deceased, it was murder in second degree; but that it was murder in the first degree if such time had elapsed, and then he went with deadly weapon to kill, and did kill him with malice aforethought, was proper.

4. Idem—*Harmless modification.*—Accused asked for instruction that if deceased had threatened to kill him and he was informed of the threat, and before he fired the fatal shot, deceased did some overt act from which accused could reasonably infer he intended to carry out his threats, the killing would be excusable homicide. The court inserted the clause, '·and that accused killed deceased to prevent him from killing him, or doing him great bodily harm:" *held,* not error, as the modification was innocuous.

5. Idem.—Accused moved that the court instruct that if he went to house where the homicide took place, to stop a quarrel between deceased and his wife, and to require apology for previous insults, and when he attempted to do so, deceased attacked him with deadly weapon, the homicide was not murder. The court modified the instruction by inserting the word "peaceably" before "went," and before "to stop." *Held:* No error.

6. Motion for New Trial—*Case at bar.*—The evidence disclosed by the record in this case warrants the verdict of guilty of murder in the first degree, and the motion for a new trial was properly overruled.

Error to judgment of circuit court of Greensville county, rendered January 8th, 1890, on an indictment against the plaintiff in error, Randall Watson, for the murder of one Joe Robinson. This was the second conviction of Watson for the homicide committed December 26th, 1886. The first conviction was brought here on writ of error, and the judgment was reversed March 7th, 1889, for misdirections to the jury. See 85 Va., 867. Upon the second trial, had in said circuit court, plaintiff in error was again convicted of murder in the first degree, and the case brought here again on error. Opinion states the case.

*Davis & McIlwaine*, for the plaintiff in error.

*Attorney-General R. Taylor Scott*, for the Commonwealth.

LACY, J., delivered the opinion of the court.

This is a writ of error to a judgment of the circuit court of Greensville county, rendered at the special term of that court held on the 8th day of January, 1890, and is to a second conviction of the plaintiff in error of murder in the first degree, for a homicide committed on the 26th day of December, 1886. The first conviction was brought here on writ of error, and decided March 7, 1889, when the judgment was reversed for misdirection by the circuit court in its instructions to the jury, which is reported at page 867 of 85 Va. Upon the second trial, which was had in the said circuit court, the plaintiff in error was again convicted of murder in the first degree, and the case was brought to this court, as before, by writ of error.

The errors assigned are, so far as exceptions appear upon the record: (1) That the accused, being sworn as a witness in his own behalf, and having testified that the deceased had abused his wife by speaking slanderous words concerning her, was asked whether the woman in question was actually law-

fully married to him. (2) That the circuit court misdirected the jury to the prejudice of the accused as to the law of the case. (3) That the circuit court overruled his motion to set aside the verdict and grant him a new trial, because the verdict was contrary to the law and the evidence, as set forth in full under his second bill of exceptions; and the error assigned at the hearing here that the record does not affirmatively show that any *venire facias* was ever issued in the case for the summoning of the grand jury. The record sets forth the caption of the indictment and the indictment in full in the county court, where the indictment was found, and sets forth that in the said court, on a day named, certain named persons, at the courthouse of the said county, in the said court, were sworn a special grand jury of inquest in and for the body of the county of Greensville, and, having received their charge, were sent out of court, and after some time returned into court and presented an indictment for felony, a true bill; and then follows the indictment in full. Being arraigned thereunder, the accused elected to be tried in the circuit court, as his right was, and in the said last-mentioned court he pleaded not guilty, and was convicted as stated; and there was no objection of any sort taken to the manner of summoning the grand jury, until after verdict and judgment upon appearance here to prosecute his writ of error on other grounds.

In the first place, there does not appear to be any irregularity in the mode of summoning the grand jury. Nothing upon that subject appears upon the transcript of the record as sent up to the circuit court upon the prisoner's election to be tried there. Section 4016 of the Code of Virginia provides that in such case the trial shall be in the county court, "except that a person to be tried for any felony for which he may be punished with death may, upon his arraignment in the county court, demand to be tried in the circuit court having jurisdiction over the county for which said county court is held. Upon such demand the accused shall be remanded for

trial in the said circuit court, and all the material witnesses desired for the prosecution or defence shall be recognized for their attendance at such trial. When a person is remanded as aforesaid by a county court, the clerk thereof shall certify and transmit to the clerk of the court in which such person is to be tried a transcript of the record of the proceedings in said county court in relation to the prosecution, and copies of the indictment and recognizances and other papers connected with the case. Such transcript and copies shall be used with the same effect as the originals." The transcript is to begin with the indictment and recognizances, and other papers connected with the case are to follow as stated. These papers are all sent up, and all appear to be in due and regular form. No *venire facias* for the summoning of the grand jury appears on this transcript, nor does the accused make any objection on that account, but proceeds with the trial. Are we to presume here that because no *venire facias* was sent to the circuit court with the transcript required by law, therefore no *venire facias* was ever issued? It is the prosecution in this case that is to be brought up with the transcript, and that begins with the indictment, which must have been found in due course of law; and the person accused has the right to have the law complied with in the matter of summoning and in the organization of the grand jury and the impaneling of that body; and the courts afford some remedy for every violation of a person's rights. While a defendant may not go into the question of the evidence before a grand jury, nor the question of the swearing of the witnesses there, as there is then only an *ex parte* hearing of testimony, and there may be no witnesses, the grand jurors finding upon their own knowledge, not a question of guilt or innocence, but that an offence is charged to have been committed, but if there be an incompetent grand juror, to whom exception is to be taken, or when as to the whole body, as, for instance, that the grand jury consisted of too many members, or too few, or that it was other-

wise incompetent, or an irregularity in the summoning or impaneling of the grand jury, or the selecting of the jurors, or in any case where the authority of the body under the law of the land is wanting, and there is an illegal constitution or organization, an opportunity is afforded the accused, who is thus unlawfully charged, to effectively except to such error, because he cannot be tried for a felony until he has been legally indicted. This objection being as to matter before the trial begins and preliminary thereto, it must be drawn to the attention of the court by plea before pleading to the merits. This must be done then in some way. There are some defects that may be reached by motion to quash, but it is sometimes by challenge, and, when that method is not used or not recognized, plea in abatement is the usual and proper method. If a grand juror is incompetent to serve as such personally—that is, when he lacks some requirement of the law, or when he has some quality which, under the law, excludes him—and when the number is illegal, or when there is any irregularity in the summoning or impaneling of the jury which would vitiate the whole finding if not waived, then the defendant may protect himself against this infraction of the law and abridgment of his rights by plea in abatement. And objections of this sort are considered as waived by a plea to the merits; therefore they cannot be taken advantage of at the trial, and, *a fortiori*, it is too late after verdict to raise an objection of this sort. If defects appear of record which show that the grand jury was an illegal body, either having been summoned without authority or going to the extent of showing that the grand jury was not a legal body lawfully attached to the court, it would be a different question, and considered and treated differently upon a motion in arrest of judgment. But where the record is merely silent, then the presumption of law is that all will be presumed to have been rightly done; and in such case, as in this case, the whole matter is put to rest by our law. Section 3985 of the Code provides, as to the

findings of grand jurors, that "no irregularity in the time or manner of selecting the jurors or in the writ of *venire facias* or in the manner of executing the same shall vitiate any presentment, indictment, or finding of a grand jury." In this case, on this question, nothing appears upon the record to suggest any irregularity of any sort in this respect, and, as no exception has been taken or urged in the two hotly contested trials below, it is a just and reasonable presumption of law that none exists; and no doubt it is perfectly true that no such error exists in the court from which the case was originally transferred, and there is no law requiring such paper to appear in the circuit court. 1 Bish. Crim. Prac., § 872, p. 516; *Durr* v. *State*, 53 Miss., 425; *State* v. *Carver*, 49 Me , 588; *McCullough* v. *Com.*, 67 Pa. St., 30, 31, 33; *Mershon* v. *State*, 51 Ind., 14; *U. S.* v. *Hammond*, 2 Woods, 197; *State* v. *Dixon*, 3 Iowa, 416; *State* v. *Hinkle*, 6 Iowa, 380; *Com.* v. *Smith*, 9 Mass., 107; *People* v. *Roberts*, 6 Cal., 214; *Shropshire* v. *State*, 12 Ark., 190; *Harding* v. *State*, 22 Ark., 210; *Montgomery* v. *State*, 3 Kan., 263; *Doyle* v. *State*, 17 Ohio, 222; *McQuillen* v. *State*, 8 Smeades & M., 587; *Rawls* v. *State, Id.*, 599; *Newman* v. *State*, 14 Wis., 426.

As to the first exception—that the question was allowed to be asked by the court of the prisoner whether the woman called his wife, and in whose behalf he claimed to have committed the homicide, was really his wife, and when and by whom they were married, if they were legitimately married— there is no error perceived in this action. The accused had committed a homicide, and upon the witness stand had admitted it, and claimed to have done so because of insulting words spoken of and concerning his said wife. He claimed that she was his wife, and, if so, then that she was legitimately so, and the place where and by whom she was married to him were inquiries in pursuance of his own assertion, and it could by no possibility injure him, except that it might turn out by cross-examination to be false, and to this, like all other wit-

nesses, he must submit. The cross-examination was proper and altogether admissible, and is a valuable test of truth.

The third exception is as to the refusal of the court to set aside the verdict and grant the accused a new trial, on the ground that the said verdict is contrary to the law and the evidence. The evidence in this case is certified, and from it it appears that while at a party at a man's house named Lemon Carey, about four weeks before Christmas, 1886, the deceased took something from the table of his former wife, from whom he had separated, and refused to pay for it; that the accused rebuked him for this, and the deceased became angry, and accused him of doing the same thing about something else. The dispute growing warmer, a fight ensued, in which the deceased was badly used, face cut and bloody, and the throat cut. Other parties were present and interfered, and the fight was stopped. The deceased, while in the heat of this quarrel, abused the wife of the accused, was very offensive as to her, and said as to the prisoner that he had stolen mules in North Carolina, and was a fugitive from justice, and had run away with another man's wife after killing the husband. The deceased then made his escape, and left the prisoner in a great rage, who went straight home and got his gun and pursued the deceased, loudly proclaiming that he would kill him unless he took back what he had said about his wife, saying nothing of the things he had said about himself. The deceased escaped into a house, and the door was held against the accused by others, but the accused, gun in hand, stood guard around the house all night, and the sun rose upon him next morning still bent upon murder; but, it being Sunday morning, the railroad section master ordered him to go off with his gun, which he did, still proclaiming his purpose to kill on sight. At another time, gun in hand, he waylaid the deceased standing in a chimney corner of a house in which the deceased was secreted, but the deceased did not come out of the house, and the prisoner, being

discovered, went off. Some four weeks after the first fight, on the 26th day of December, 1886, the deceased went to the house (after night) of his wife or his former wife, which was on the same farm with the prisoner, where the prisoner was a sort of head man, and began a dispute with his former wife. The prisoner, hearing where he was and what he was doing, got his gun, and hastened to the spot, and was standing under cover of the darkness in the chimney corner close by the deceased as he stood talking with his former wife. The prisoner being thus discovered, rushed around the corner of the house, crying out, "You G——d d——d son of a bitch, crack your lips, and I will blow your brains out!" shot at once, shooting the deceased through the head, and killing him instantly. An old, broken, unused, and unloaded pistol was found under the leg of the deceased as he lay upon the ground, and the accused said the deceased offered to shoot him with this pistol, and he shot in self-defense only; and the doctor testified that this pistol could not have been drawn after the deceased was shot, but it does not follow that he did not attempt to draw it after the attack was made on him, or that it did not fall out of his pocket as he fell. However this may be, the accused was the attacking party, and he made this attack after numerous and often-repeated threats to kill the deceased. He has himself testified in the case; and he is studious to exclude the conclusion that he ever saw Joe Robinson after the fight without attacking him. After speaking of the quarrel, he says: "I then went home and took my gun and went down to the shanty to look for Joe Robinson. I knocked at the door and asked for Joe Robinson. Ridley said, 'Yes, he is here,' but would not open the door. I do not remember whether I tried to break open the window or not. I told Joe Robinson I intended to shoot him if he did not take back what he had said about my wife. Being unable to get in the house, I went home, and the next morning, about sunrise, I went back there looking for Joe Robinson. From that time I did not see Joe

Robinson until the time of the killing.  I was at Wiseman's, but did not see Joe Robinson, and did not know that he was there."  (This is the place where he is said to have been lying in wait, gun in hand, and where one of the witnesses tole Joe Robinson, "There is Randall Watson looking for you with that same gun.")  The intimation is that if he had seen him he would have killed him before he did.  He constantly kept to the front the abuse spoken of his wife, but it will be remembered that Joe Robinson had intimated a dangerous knowledge of the prisoner's past life, proclaiming him a fugitive from justice, a mule thief, and a murderer at large.  Whether this intimation had any effect in keeping alive for four weeks this unfailing determination to kill we do not know.  The accused said that when he fired the fatal shot Joe Robinson was advancing upon him with a pistol pointed, threatening to kill him, but this is contradicted by the other witnesses, who say that Randall Watson rushed from his place behind the chimney, gun in hand, declaring his purpose to shoot at once, shooting at close quarters, and with fatal effect.  The jury—the proper triers of the weight of the testimony—have found that the killing was willful and deliberate, and with malice aforethought, and was murder in the first degree, and this verdict is abundantly sustained by the evidence in the record ; and we are of opinion that the circuit court did not err in overruling the motion for a new trial, and properly refused to set aside the verdict, and that there is no error in this action of the trial court.

It only remains to inquire whether there was error to the prejudice of the plaintiff in error as to the instructions given by the judge of the court to the jury as to the law of the case. The second exception is as to the refusal of the court to give the instructions asked for by the accused, numbered 1, 2 and 3, and giving in lieu thereof of those numbered 9, 10 and 11. The first instruction was as follows, as asked : " The court instructs the jury that if they believe from the evidence that

the prisoner at the time that he fired the fatal shot was acting in the heat of passion engendered by the slanderous words spoken by the deceased about the wife of the prisoner, which were in themselves calculated to provoke a high degree of violence, then the killing would be murder in the second degree, unless they further believe from the evidence that a sufficient time had elapsed since the slanderous words were spoken for the passions engendered thereby to have cooled and subsided, and that the prisoner then shot Joe Robinson from a willful, deliberate, and premeditated purpose to kill him." Instead of this the court gave the following: "The court instructs the jury that if they believe from the evidence that the prisoner at the time he fired the fatal shot was acting in the heat of passion engendered by slanderous and abusive words spoken by the deceased about the wife of the prisoner, which were in themselves calculated to provoke a high degree of violence; that a sufficient time had not elapsed since the words were spoken for the passions engendered thereby to cool and subside, then the killing is murder in the second degree. But if the jury believe from the evidence that a sufficient time had elapsed since the slanderous and abusive words were spoken for the passions engendered thereby to cool and subside, and that afterwards Randall Watson went to the place of the fatal encounter, armed with a deadly weapon, for the purpose of killing Joe Robinson on account of the slanderous and abusive words so spoken of his wife, and did kill him on that account, willfully, and with malice and premeditation, then Randall Watson is guilty of murder in the first degree." There is no error in this instruction. It is correct in all respects, and clearly expounds the law upon the subject in hand. The first instruction asked and refused was substantially the same, and was in fact given when the ninth was given.

The second instruction asked by the accused was as follows: "The court instructs the jury that if they believe from the evidence that before the time of the fatal encounter Joe Robin-

son had threatened to beat or kill Randall Watson, that such threats had been communicated to Randall Watson, and if they further believe from the evidence that at the time of the encounter and before the fatal shot was fired Joe Robinson did some overt act from which Randall Watson could reasonably infer that Joe Robinson was about to execute the said threats by killing him or doing him some serious bodily harm, then the killing of Joe Robinson by Randall Watson would be excusable homicide, and not murder." In lieu of the words, "then the killing of Joe Robinson by Randall Watson would be excusable homicide, and not murder," the following, "and that Randall Watson killed Joe Robinson to prevent him from killing him or doing him serious bodily harm, then the jury must find the prisoner not guilty," were given. These words were not injurious to the prisoner, but more favorable than those asked by him, and his exception to them is groundless.

The third instruction asked by the prisoner was as follows: "If the jury believe from the evidence that Randall Watson went to the place of the fatal encounter for the purpose of stopping the disturbance there, and to demand an apology for the grievous and abusive words he had spoken of the wife of Randall Watson, and that he did demand of Joe Robinson an apology, but that the said Robinson, in response to a demand for an apology, gave none, but advanced upon the prisoner with a pistol, then the shooting by Randall Watson was excusable homicide, and not murder." In lieu of this the court gave the following: "The court instructs the jury that if they believe that Randall Watson went to the place of the fatal encounter for the purpose of peaceably stopping the disturbance there, and for the purpose of peaceably demanding an apology of Joe Robinson for the grievous and abusive words spoken of his wife, and that he did not go there for the purpose of killing Joe Robinson, or of having a difficulty with him in the event he should refuse to give the required apology, and that Randall Watson did go there and peaceably endeavor to stop the

disturbance, and did peaceably demand an apology of Joe Robinson, and that Joe Robinson refused to give the apology, but advanced upon Randall Watson with a pistol, and that Randall Watson killed Joe Robinson under the belief that it was necessary to save his life, or himself from some bodily injury, then the jury must find him not guilty." The plaintiff in error earnestly contends that the giving of this instruction was greatly to his prejudice, and was erroneous in that the word "peaceably" was inserted therein four times. But this instruction correctly expounds the law upon the subject. The theory of the instruction asked by the accused was that the purpose of stopping the disturbance was an act of peace, and not of battery, and only in that sense could it be given properly to the jury. The accused could not rightfully ask the court to instruct the jury that he had a right to go there to stop the disturbance by making a greater disturbance, to stop a quarrel by the act of killing the participants, to seize upon the situation into which he had surprised his enemy, whose life he had been so long and so openly seeking, to consummate his cherished purpose of murder, to cover his murderous purpose by a show of protecting the peace—to do this was murder. But if he went on a mission of peace, to peaceably stop a disturbance, and to peaceably demand an apology for his cause of quarrel with the deceased, then, if he thus stood and acted *bona fide* in the attitude and played the role of peace-maker, and so peaceably acting was assaulted with a deadly weapon, drawn and aimed at his life, and killed his assailant in self-defence, then the jury, finding this to be true, should have found him not guilty. This was the claim he set up, with the addition that his purpose was to kill on sight unless the apology was promptly forthcoming, which apology he said he expected to get. The instruction, as amended, was well adapted to meet the line of evidence set up by the accused in his own defence, and was properly given by the court, and we perceive no error in that action of the court.

There were other instructions given by the court at the motion of the accused and of the Commonwealth, no objection to which have been urged in this court, and which appear to be plainly right. This disposes of all the exceptions upon the record and all the assignments of error here, and upon the whole case we perceive no error in the action of the circuit court, and the judgment of that court in the case will be affirmed here.

FAUNTLEROY and HINTON, JJ., dissenting.

JUDGMENT AFFIRMED.