Syllabus.

## Staunton.

### RAYMOND. SCOTT v. COMMONWEALTH.

September 17, 1925.

1. APPEAL AND ERROR—*Conflicts in Evidence.*—The jury are the sole arbiters of direct conflicts of evidence, and unless there is no evidence in the case to support the verdict the issue as determined by the jury is final.

2. HOMICIDE—*Self-Defense—Evidence to Support Verdict that Homicide was not in Self-Defense.*—In the instant case, a prosecution for homicide, the evidence was clearly sufficient to warrant the conclusion that the defendant did not slay the deceased in defense of his life or limb, and there was ample evidence to support a verdict of guilty of murder in the second degree.

3. HOMICIDE—*Self-Defense — Necessity—Misconduct of Defendant.*—The law of self-defense is the law of necessity and the necessity relied upon to justify the killing must not arise out of the prisoner's own misconduct.

4. HOMICIDE—*Self-Defense—Misconduct of Defendant—First Blow.*—Although deceased struck the first blow, if this was brought about by defendant's misconduct, defendant cannot avail himself of the law of self-defense.

5. HOMICIDE—*Self-Defense—Misconduct of Defendant.*—The misconduct of defendant which will deprive him of the benefit of the law of self-defense is not confined to the physical acts of the chief assailant but contemplates, extends to, and includes such violent and indecent language as is well calculated to provoke a breach of the peace.

6. HOMICIDE—*Self-Defense—Misconduct of Defendant—Insulting Words.*—While words alone, however insulting or contemptuous, are never sufficient provocation to justify an assault, it should also be true that one who applies to another the most vile and opprobrious epithet known to mankind, and thus brings on the combat, should not be permitted to justify the killing of another in resisting an assult so provoked on the ground of necessity.

7. HOMICIDE—*Provocation.*—In no case will the plea of provocation avail the party, if it were sought for and induced by his own act, in order to afford a pretense for wreaking vengeance.

8. HOMICIDE—*Murder—Malice.*—To warrant the conviction of a defendant for the crime of murder it is essential that the Commonwealth shall show that the killing was done with malice.

9. HOMICIDE—*Murder—Proof of Malice.*—Malice may be shown by direct proof of malice, or malice may be presumed from the fact of killing, when the killing is unaccompanied by circumstances of palliation.

10. HOMICIDE—*Malice—Deadly Weapon.*—One of the canons of the criminal law is that a mortal wound given with a deadly weapon, in the previous possession of the slayer, without any or upon very slight provocation, is *prima facie* wilful, deliberate, and premeditated killing, and throws upon the accused the necessity of proving extenuating circumstances.

11. HOMICIDE—*Degree of Homicide—Burden of Proof.*—In a prosecution for homicide the burden is upon the defendant if he seeks to reduce the offense to voluntary manslaughter to prove that the act was committed without malice and in a sudden heat of passion.

12. HOMICIDE—*Murder or Manslaughter—Case at Bar.*—In the instant case defendant approached the conflict with deliberation. He invited the deceased to stop him, if he could, in the use of vile language against the deceased's father, and prepared for the encounter by laying aside his coat. Deceased was unarmed, and the provocation received by the defendant in being struck with the fist was not such a provocation as warranted defendant in using a knife and slaying deceased. The killing therefore being unaccompanied by palliating circumstances was murder and not manslaughter.

13. HOMICIDE—*Murder—Malice.*—The malice necessary to constitute murder may be either express or implied.

14. HOMICIDE—*Murder—Manslaughter—Sudden Heat of Passion.*—In the instant case defendant provoked deceased to strike him by violent and indecent language directed at the father of the deceased. When deceased asked him to desist, defendant prepared for combat by laying aside his coat. Deceased was unarmed and in the ensuing struggle defendant killed him with a knife.

   *Held:* That the homicide was not committed in a sudden heat of passion, and therefore without malice.

15. HOMICIDE—*Arrest of Defendant's Companions—Res Gestae.*—In a prosecution for homicide, the difficulty between deceased and defendant arose out of the arrest of defendant's companions by the father of deceased.

   *Held:* That the arrest of the companions of defendant was a part of the *res gestae* and was subject to the fullest investigation.

16. HOMICIDE—*Evidence—Injuries of Defendant.*—In a prosecution for homicide, testimony of witnesses in regard to a hunt the Saturday night preceding the killing, on which defendant received a fall and sustained injuries therefrom, was admissible in rebuttal of the evidence of defendant that he received the injuries in the difficulty with deceased.

17. HOMICIDE—*Evidence—Injuries of Defendant—Previous Intoxication of Defendant.*—In a prosecution for homicide defendant claimed that

he had received certain injuries from deceased at the time of the homicide. Several witnesses testified that he received the injuries in question while hunting on the previous Saturday, and that on that occasion he was intoxicated. It was argued that the alleged fact that defendant was intoxicated, as testified to by the witnesses, was calculated to prejudice the jury against him.

*Held:* That to require the court to segregate the question of intoxication from other evidence relative to a matter pertinent and material, was to place too great a burden upon the trial court. It was impossible to describe the occurrence without weaving into the same the subject of the intoxicated condition of the defendant.

18. Homicide—*Instructions—Self-Defense—Difficulty Provoked by Accused.*—In a prosecution for homicide the court instructed the jury that if they believed from the evidence, beyond a reasonable doubt, that the defendant wrongfully provoked a difficulty with the deceased and thereby brought on the difficulty in which the defendant stabbed and killed the deceased, the jury cannot legally acquit the defendant on the grounds of self-defense.

*Held:* That while the verbiage of the instruction was amenable to criticism, the giving of the instruction did not constitute error.

19. Homicide—*Instructions—Concurrence of Twelve Minds.*—In a prosecution for homicide the trial court refused to instruct the jury that the law contemplates a concurrence of twelve minds in the conclusion of guilt before a conviction can be had, and that this is not only true with respect to the guilt of the accused, but is likewise true with respect to the degree of the crime, and that it was not the duty of a juror who entertained a reasonable doubt as to the guilt of the accused, or as to the degree of the guilt of the accused, to surrender his convictions simply because the rest of the jury entertained different convictions.

*Held:* That while the instruction might probably, with propriety, have been given, the refusal to give it did not constitute reversible error.

20. Jury—*Verdict—Conviction of Juror.*—No juror should ever yield a conscientious opinion deliberately formed after a full and fair investigation of the case, as to the guilt or innocence of the accused, but jurors should not be invited to disagree.

21. Homicide—*Instructions—Self-Defense—Justification of an Assault.*—In a prosecution for homicide, where the defense was self-defense and the Commonwealth showed that although deceased struck the first blow the difficulty was provoked by defendant, instructions that offensive or insulting words alone do not justify an assault, and that if the jury believed that offensive or insulting words were spoken by the defendant to deceased, they would not justify or excuse the deceased in striking or bringing on a difficulty with defendant, were properly refused as inapplicable to the instant case, although abstractly correct.

22. HOMICIDE—*Argument of Counsel—Finding of Brass Knucks Near the Scene of the Homicide.*—In a prosecution for homicide, where the defense was self-defense, remarks of counsel for the prosecution as to the finding of brass knucks near the place of the homicide, to the effect that the knucks were placed there for the purpose of fabricating a defense, and then found by a witness in an effort to corroborate the tale of the defendant that deceased had struck him with brass knucks, were not unwarranted and highly prejudicial to the defendant, as there was evidence supporting counsel's view.

23. HOMICIDE—*Argument of Counsel—Drunkenness of Defendant.*—In a prosecution for homicide counsel for the prosecution asserted in argument that defendant filled himself full of whiskey and went to deceased's home to talk about his father and thereby bring about a difficulty. The evidence disclosed that the difficulty occurred in close proximity to the house of deceased, and that defendant "seemed to be under the influence of liquor a little bit."

    *Held:* That the remarks of counsel did not constitute reversible error.

24. ARGUMENT OF COUNSEL—*Immaterial and Material Statements.*—Courts ought not to reverse cases because counsel in the heat of argument sometimes wander a little way outside the record. If a matter of great materiality is brought into the record as a matter of extended comment, then there would be reason for setting aside the verdict. If every immaterial assertion or statement which creeps into an argument was to be held ground for reversal, courts would be so much occupied in criticising the addresses of advocates as to have little time for anything else.

Error to a judgment of the Circuit Court of Wise county.

*Affirmed.*

The opinion states the case.

*D. F. Kennedy, Morton & Parker* and *R. P. Bruce,* for the plaintiff in error.

*John R. Saunders,* Attorney-General, *Leon M. Bazile* and *Lewis H. Machen,* Assistant Attorney-Generals, for the Commonwealth.

CAMPBELL, J., delivered the opinion of the court.

This is a writ of error to a judgment of the circuit-court of Wise county.

The plaintiff in error (hereinafter called defendant) was indicted for the murder of Ray Suthers, at Big Stone Gap, on Sunday evening, December 21, 1923, was tried on the 16th day of June, 1924, found guilty of murder in the second degree and sentenced to confinement in the penitentiary for the term of seven years.

The first assignment of error is that the court erred in refusing to set aside the verdict of the jury, because the same was contrary to the law and evidence.

From the record it appears that the defendant, a married man, had been to the house of a woman by the name of Collins, where there were several girls, and remained about half an hour. While in the house he was informed that his companions, with whom he had gone to the house, had been arrested.

John Suthers, father of the deceased, was the town policeman who had arrested the companions of the defendant.

Upon receiving the information of the arrest, defendant ran out of the house, and meeting Ray Suthers, asked him who it was that his father had arrested.

Suthers replied he did not know; defendant in reply said he would not let any "G—— d—— s—— o—— a b—— arrest him who had played poker with him and drunk whiskey with him." He also called Suthers, Sr., a bootlegger and a gambler. Deceased told defendant not to talk like that and defendant told Suthers to stop him if he could and stepped back and laid his coat down; whereupon Suthers struck defendant on the nose, knocking him back about fifteen feet, according to the evidence of several of the witnesses.

A scuffle then ensued and both combatants fell to the

ground.    During the melee the defendant inflicted
upon the deceased, with a knife, a wound near the
collar bone which severed "a blood vessel," also
wounds on the left wrist, and near the right shoulder
blade, and cut the right ear in two. From the wound
severing the artery Suthers died a short period after
the cutting.

Defendant, testifying in his own behalf, stated that
he cut deceased because he struck him with steel
knucks on the nose and was beating him with the
knucks while they were fighting upon the ground and
that the cutting was done in self-defense. In corrobor-
ation of his statement that knucks were used, he in-
troduced a witness named Thompson who testified that
he found steel knucks the morning after the difficulty,
near where the same took place.

In rebuttal, the Commonwealth introduced the
doctor who treated defendant, who testified that the
wound on the nose could not have been made with steel
knucks; that the wound was an incised wound and
was made with a sharp instrument. The Common-
wealth also introduced Gordon Gilley, the mayor of
the town, who testified that on Saturday night pre-
ceding the killing the defednant, while hunting in the
mountain, became "pretty drunk" and fell down several
times, "at one time he fell probably fifty yards down
the mountain." Another witness testified that he fell
"face forward and went down the hill."

This evidence was introduced to account for the
wound on the nose of defendant.

The defendant introduced several witnesses who
testified that the defendant did not have any wounds on
his face on Sunday evening.

The Commonwealth also introduced a witness who
testified that he saw the defendant immediately after

the killing and he "seemed to be under the influence of liquor a little bit."

In a dying statement Suthers stated that he struck the defendant with his fist, and was "aiming to fight him a fair fight, when Scott used a knife."    *    *    *

Four eye witnesses testified that they did not see any steel knucks.upon the hand of the deceased.

[1] The first contention of the defendant is that the killing was done in self-defense. Upon the question of the use of steel knucks by the deceased there is a direct conflict of evidence; this conflict has been determined by the jury, who are the sole arbiters of the matter, against the contention of the defendant.

[2–4] This being true, the defendant has lost upon the issue of self-defense, and unless there is no evidence in the case to support the verdict the issue as determined by the jury is final. From the facts stated, *supra*, we are of the opinion that the evidence is clearly sufficient to warrant the conclusion that the defendant did not slay the deceased in defense of his life or limb, and further that there ·is ample evidence to support the verdict. While it is true, as shown by the testimony of all the witnesses, that the deceased struck the first blow, the evidence to our mind is conclusive that this was brought about by the defendant's misconduct. That "the law of self-defense is the law of necessity and the necessity relied upon to justify the killing must not arise out of the prisoner's own misconduct," is a principle too well settled to require the citation of authority to support it.

[5] The misconduct contemplated by the law is not confined to the physical acts of the chief assailant, but contemplates, extends to, and includes such violent and indecent language as is well calculated to provoke a breach of the peace.

[6] While it is true, as said by Judge Moncure in *Read* v. *Commonwealth*, 22 Gratt. (64 Va.) 939, that words alone, however insulting or contemptuous, are never sufficient provocation to justify an assault, it should also be true that one who applies to another the most vile and opprobrious epithet known to mankind, and thus brings on the combat, should not be permitted to justify the killing of another in resisting an assault so provoked on the ground of necessity.

That the rule here laid down is not universal is conceded. In Brill's Cyclopedia Criminal Law, vol. 1, section 432, it is said:

"Generally speaking, mere opprobrious or abusive language does not make the person using it the aggressor in a resulting difficulty." See case cited.

However, there is a high authority for the position here taken. In *State* v. *Council*, 129 S. C. 119, 123 S. E. 789, it is said:

"Was it error for the trial judge to charge the jury the legal effect of the use of opprobrious and insulting words by one who pleads self-defense? The charge was rendered necessary by the evidence. A man may deprive himself of the right of self-defense by words as well as by acts, and the judge was bound to tell the jury so."

In *Howard* v. *State*, 122 Ark. 422, 183 S. W. 743, it is held that a person who brings on a combat by insulting language must endeavor to retire and decline further contest before he is justified in slaying his adversary.

[7] It has long been the law that "in no case will the plea of provocation avail the party, if it were sought for and induced by his own act, in order to afford him a pretense for wreaking vengeance." Davis' Criminal Law, p. 85.

Having reached the conclusion that this assignment of error is without merit, we will now consider the degree of the offense for which the accused could be lawfully convicted.

It is forcefully contended by the learned counsel for the defendant that the evidence does not disclose that an offense of a higher degree than voluntary manslaughter has been committed.

[8] To warrant the conviction of the defendant for the crime of murder it is essential that the Commonwealth show that the killing was done with malice.

[9, 10] This may be shown by direct proof of malice, or malice may be presumed from the fact of killing, when the killing is unaccompanied by circumstances of palliation. One of the canons of the criminal law is "that a mortal wound given with a deadly weapon, in the previous possession of the slayer, without any or upon very slight provocation, is *prima facie* wilful, deliberate, and premeditated killing, and throws upon the accused the necessity of proving extenuating circumstances."

[11] The burden is also upon the defendant if he seeks to reduce the offense to voluntary manslaughter to prove that the act was committed without malice and in a sudden heat of passion.

[12-14] The evidence shows that the defendant approached the conflict with deliberation, that he invited the deceased to stop him, if he could, in the use of the vile language against his father, and prepared for the encounter by laying aside his coat. If the evidence for the Commonwealth be true, that the deceased was unarmed, and the jury have said it is true, the provocation received by the defendant in being struck with the fist was not such a provocation as warranted him in using a knife and slaying his adversary.

The danger, if any, that the deceased with his fist would inflict death or serious bodily harm upon defendant was remote, for the reason that the brawl was witnessed by several people, some of whom interfered when it was apparent that serious injury was imminent. It being made to appear that the killing was unaccompanied by palliating circumstances, the next question is, was the homicide committed in the sudden heat of passion, and therefore without malice. The malice necessary to constitute murder may be either express or implied.

In defining the terms *murder* and *malice*, Mr. Chief Justice Shaw, in *Commonwealth* v. *Webster*, 5 Cushing (Mass.), 295, 52 Am. Dec. 711 (1850), said: "Murder, in the sense in which it is now understood, is the killing of any person in the peace of the Commonwealth, with malice aforethought, either express or implied by law. Malice, in this definition, is used in a technical sense, including not only anger, hatred and revenge, but every other unlawful and unjustifiable motive. It is not confined to ill-will towards one or more individual persons, but is intended to denote an action flowing from any wicked and corrupt motive, a thing done *malo animo*, where the fact has been attended with such circumstances as carry in them the plain indications of a heart regardless of social duty, and fatally bent on mischief. And therefore malice is implied from any deliberate or cruel act against another, however sudden."

In the instant case, the defendant provoked the deceased into striking him by violent and indecent language directed at the father of the deceased.

From the record it does not even appear that the defendant made any enquiries as to why the custodian of the law had arrested his companions. The grava-

men of the offense seemed to be that they had been arrested by one whom he designated as a "G—— d—— s—— o—— a b——, a gambler and a bootlegger."

When called upon by the deceased to desist in his application of opprobrious epithets, he made ready for the fray by laying aside his coat.

One witness for the Commonwealth, Dorthula Roller, testified that she heard the mother of the deceased call to defendant and tell him not to cut her boy with *the* knife. It is true the Commonwealth did not introduce the mother of deceased as a witness, but the jury were warranted in drawing the inference that the knife had been seen in the hand of the defendant before the parties fell to the ground. As stated, *supra*, the jury, by their verdict, found against the contention of the defendant that it was necessary to use the knife, and therefore, that the encounter was brought on by the defendant with the object of provoking the deceased to strike him and thus afford him an opportunity to take the life of the deceased.

In *Honesty's Case*, 81 Va. 292, this court approved the following instruction:

"Although the jury may believe from the evidence that the prisoner struck the deceased the blow which caused his death during a quarrel, yet, if they further believe from the evidence, beyond a reasonable doubt, that the quarrel was provoked and brought on by the prisoner, with the object to provoke the deceased to strike him, in order to have a pretext to take his life, and that the prisoner did thus strike the deceased the fatal blow, from which he died, as charged in the indictment, then they are instructed that such an act constitutes a wilful, deliberate and premeditated killing, and as such is murder in the first degree."

To reduce the homicide from murder in the second

degree to manslaughter, the burden was upon the accused to introduce evidence to show justification or extenuating circumstances. The plea of justification has already been disposed of. Not a scintilla of proof was introduced by the defendant to show any extenuating circumstances such as the law contemplates.

His whole case rested upon the foundation of self-defense, as is shown by the following testimony.

"Q. Where were you hit?

"A. Across the nose.

"Q. With what?

"A. A pair of knucks.

"Q. What effect did it have on you?

"A. He knocked me off twelve or fifteen feet and when I come to I was grumbling something and gasping for wind, and he struck me in the back of head and knocked me down again, and he kicked the breath out of me, and kicked me in side and I got my knife out and I went to cutting and he got on his feet and I reached around him and cut him and then he hit me across neck.

"Q. What did you cut him for?

"A. I cut him to get him off of me, did not think I would kill him.

"Q. Were you going to kill him?

"A. No, sir.

"A. I was trying to stop him."

We are of the opinion that the jury were warranted in finding the defendant guilty of murder in the second degree.

The second assignment of error is as follows:

"Be it remembered that during the progress of the trial of this case, Claud Kegley, a witness for the defendant, was, on cross examination, asked the following questions and made the following answers:

"Q. Did he ask you who you were?

"A. He knowed who I was, he asked the other boy.

"Q. Did they tell him?

"A. The boy did not want to tell him and I told him.

"Q. Did not the boy refuse to tell him his name and didn't you refuse to tell him?

"A. No, sir.

"Q. Did he tell Mr. Suthers he did not know his name himself?

"A. I did not hear him.

"Q. Didn't you tell Mr. Suthers that you had never saw that boy before?

"A. No, sir; I told him I never saw Raymond Scott before.

"Q. Raymond Scott was out there?

"A. No, sir."

[15] There is no merit in this assignment. We are unable to discover anything in the language quoted that even tends to prejudice the defendant. The arrest of the companions of defendant was a part of the *res gestae* and was subject to the fullest investigation.

[16] The next assignment of error relates to the testimony of Gordon Gilley, Marshall Belcher and Mike Blessing, who testified in regard to the hunt on the mountain the Saturday night before the killing, the condition of the defendant, and his fall. This evidence was proper, in rebuttal of the evidence of the defendant that he received the injuries complained of in the difficulty.

From the severity of the falls, as described by the witnesses, the jury were well warranted in finding that the injury to the nose was received in the fall. Dr. Gilmer testified that he examined the defendant sometime after the difficulty; that in addition to the nose injury, he observed the following bruises upon

the body of defendant: "About two and one half inches below right hip joint skin was rubbed up as if run against something, and near right breast was another place about one inch and on left side of abdomen four inches from navel was another place the same as his left breast." The defendant's version of the manner in which the injuries were received was that the deceased kicked him. The jury were entitled to hear any testimony which would throw any light upon the matter.

There is no merit in this assignment of error.

[17] Another assignment of error is that the evidence of Gilley, Belcher and Blessing should have been restricted to the one purpose of accounting for the injuries received and the alleged fact that defendant was intoxicated, as testified to by the witnesses, was calculated to prejudice the jury against him. To require the court to segregate the question of intoxication from other evidence relative to a matter pertinent and material, is to place too great a burden upon the trial court.

We cannot believe that Virginia juries have arrived at the stage where they convict people of murder upon evidence of intoxication alone. It was impossible for the witnesses to describe the occurrence on the mountain without weaving into the same the subject of the intoxicated condition of the defendant.

There is no merit in this assignment.

It is also contended that the trial court erred in giving to the jury, on the motion of the Commonwealth, the following instructions:

"4. That every homicide in Virginia is presumed, in the absence of other evidence, to be murder of the second degree, and in order to elevate the offense to murder of first degree the burden is upon the Commonwealth; and in order to reduce the offense to man-

slaughter or to show justification or excuse for the killing, the burden is upon the accused to introduce evidence to show extenuating circumstances, or justification, unless it appears from the evidence of the Commonwealth.

"5. That upon a charge of murder malice is presumed from the fact of killing. When the killing has been proven, and is unaccompanied by circumstances of palliation, the burden of introducing evidence to disprove malice is thrown upon the accused.

"6. The court instructs the jury that to constitute a wilful, deliberate, and premeditated killing, it is not necessary that the intention to kill should exist any particular length of time prior to the actual killing; it is only necessary that such intention should come into existence for the first time at the time of such killing, or at any time previously.

"7. The malice necessary to constitute the crime of murder may be either express or implied. The word 'malice' in the foregoing definition of murder is used in a technical sense, and includes not only anger, hatred and revenge, but every unlawful and unjustifiable motive. It is not confined to ill will towards any one or more particular persons, but is intended to denote an action flowing from any wicked and corrupt motive, done with an evil mind and purpose and wrongful intention, where the act has been attended with such circumstances as to carry in them the plain indication of heart regardless of social duty and deliberately bent on mischief, therefore, malice is implied from any wilful, deliberate and cruel act against another, however sudden. Thus, on a charge of murder, malice is presumed from the fact of the killing, when the killing has been proven, and is unaccompanied by circumstances of palliation, and the burden of in-

troducing evidence to rebut such presumption rests upon the accused.

"8. The court instructs the jury that the law of self-defense is the law of necessity and the necessity relied upon to justify the killing must not arise out of the prisoner's own misconduct.

"9. The court instructs the jury that if they believe from the evidence, beyond a reasonable doubt, that the defendant wrongfully provoked a difficulty with the deceased and thereby brought on the difficulty in which the defendant stabbed and killed the deceased, the jury cannot legally acquit the defendant on the grounds of self-defense."

With the exception of instruction number 9, the principles of law embodied in the other instructions have been disposed of in the discussion of the question of malice and it is not necessary to discuss them further.

[18] While the verbiage of instruction number 9 is amenable to criticism, we think the principle enunciated conforms to the doctrine laid down in the instruction given in *Honesty's Case, supra,* and approved by the appellate court, and therefore it was not error to so instruct the jury in the instant case.

The next assignment of error is the refusal of the court to give, at the request of the defendant, the following instruction:

[19] "No. 9. The court instructs the jury that upon the trial of a criminal case by a jury the law contemplates a concurrence of twelve minds in the conclusion of guilt before a conviction can be had. Not only is this true with respect to the guilt of the accused, but is likewise true with respect to the degree of the crime. Therefore, if any individual member of the jury, after having duly considered all the evidence in this case, and after consultation with his fellow jurors, should

entertain a reasonable doubt as to the guilt of the accused, or as to the degree of the guilt of the accused, it is his duty not to surrender his own convictions as to the guilt or innocence of the accused, or as to the degree of guilt, simply because the rest of the jury entertain different convictions as to the guilt or innocence or as to the degree."

In *Sims* v. *Commonwealth*, 134 Va. 757, 115 S. E. 389, a similar instruction was offered by the defendant, refused by the trial court and was disposed of in the appellate court by Judge Burks who wrote the opinion as follows:

[20] "This instruction is substantially the same as instruction No. 23, given in the *McCue Case*, 103 Va. 870, 916-17, 49 S. E. 623. But in that case the instruction was given at the instance of the prisoner without objection on the part of the Commonwealth, and no objection thereto was or could have been made in the appellate court by the Commonwealth. The court was there considering errors alleged by McCue to have been committed to his prejudice, and of course the giving of that instruction, at his instance, was not one of said errors. The instruction might probably, with propriety, have been given, but it embodies principles so well understood by everyone and so fully covered by the oath of each juror that its refusal cannot be deemed error. No juror should ever yield a conscientious opinion deliberately formed after a full and fair investigation of the case, as to the guilt or innocence of the accused, but jurors should not be invited to disagree if they can. When such an instruction is given, the jury should be further instructed that the jury room is no place for pride of opinion or obstinacy, but that it is the duty of the jurors to discuss the evidence in a spirit of fairness and candor with each other, and with open minds to give careful

consideration to the views of their fellows, and, if it can be done without sacrifice of conscientious convictions, agree upon a verdict. 'By such means and such only, in a body where unanimity is required, can safe and just results be attained, and without them trial by jury, instead of being an essential aid in the administration of justice, would be a most effectual obstacle to it.' *Commonwealth* v. *Tuey*, 8 Cush. (Mass.) 1; *Odette* v. *State*, 90 Wis. 258, 62 N. W. 1054; *Jackson* v. *State*, 91 Wis. 253, 64 N. W. 838."

In view of this pronouncement, the refusal of the court, in the instant case, to give this instruction cannot be deemed reversible error.

[21] The refusal of the court to give instructions 10, 11 and 12, offered by the defendant, is assigned as error.

These instructions are as follows:

"10. The court also instructs the jury that even if they should believe from the evidence that offensive or insulting words had been spoken by the defendant to deceased, or concerning the father of deceased, howsoever grievous, still they alone can in no manner justify or excuse the deceased in striking or bringing on a difficulty, if you believe from the evidence deceased did strike or bring on a difficulty with defendant.

"11. The court further instructs the jury that offensive or insulting words alone do not justify an assault.

"12. The court further instructs the jury that words, no matter how insulting, will not justify an assault, and if they believe from the evidence that the deceased, Ray Suthers, assaulted the defendant with brass knucks or other dangerous weapon, then the said Raymond Scott had the right to defend himself as the circumstances and the force of such assault made reasonably necessary, even though the jury may further believe that the said Raymond Scott used insulting words to the said Ray Suthers prior to such assault."

While these instructions state a correct principle of law when applied to one who assaults or kills his adversary because offensive or insulting language has been used toward him, they are not applicable, as we have seen, to shield one who provokes his adversary to commit an assault, and then slays him because his adversary resents the violent and indecent insult heaped upon him.

There is no merit in this assignment.

[22] The last assignment of error calls in question certain remarks indulged in by counsel assisting in the prosecution of the case against the defendant. In the closing argument before the jury, counsel argued as follows: "(a) The defendant relies upon the plea of self-defense, saying that he was struck with brass knucks. There was no knucks there, gentlemen. After this affair was all over, the knucks were placed there for the purpose of fabricating a defense, and then found by this witness, Thompson, in an effort to corroborate the tale of the defendant." Unwarranted comment of counsel has become a hackneyed theme. In numerous decisions of this court the subject has been fully dealt with. See *McCoy* v. *Commonwealth*, 125 Va. 771, 99 S. E. 644, and authorities cited. In the latter case we read: "It appears from the evidence offered by the defendant that immediately preceding the shooting the deceased had drawn a blackjack on the accused, and was holding it in a threatening attitude, ready to strike, at the time the defendant shot him, and the testimony on behalf of the Commonwealth shows that immediately after the deceased was shot, the blackjack was found lying by his side and about a foot from his head."

During the argument of the case counsel representing the Commonwealth said: "Now, gentlemen of the

jury, I will give you my theory of how the blackjack got into the case. Just as soon as the defendant shot the deceased and he fell, Frank Skeen came up and threw the blackjack down beside the deceased."

In delivering the opinion of the court Judge Burks says: "The statement of counsel is *unsupported by any evidence in the case* and was highly prejudicial to the accused." (Italics added.) In the instant case the theory of counsel *is* supported by evidence.

The dying declaration of the deceased was that he did not strike the defendant with knucks. The evidence of the several eye witnesses was that they did not see any knucks upon the hand of deceased, either before, during or after the difficulty.

The witness, Thompson, who found the knucks the day following the affray, stated that on the night the killing occurred he made a search with a search light for knucks, without success.

Dr. Gilmer testified, as has been repeatedly stated, *supra*, that the wound on the nose could not have been made with knucks.

In view of this evidence it cannot be said that the statement of counsel was unwarranted and highly prejudicial to the defendant.

(b) The same counsel also stated in his closing remarks to the jury as follows:

"You cannot go to one's home and talk about his father, his mother or brother and thereby bring about a difficulty and cause his son to strike you and then plead self-defense. It was not manly conduct to fill himself full of whiskey and run out of the house, swearing as this boy did. It was a wilful, premeditated act that he came up there armed with a knife and premeditated to kill young Suthers, because his father had arrested his buddies."

[23] It is contended that there was no evidence that

the defendant went to the home of the deceased, nor was there any evidence that the defendant had filled himself full of whiskey. There is no merit in the assignment. The evidence disclosed that the difficulty occurred in close proximity to the house of Suthers. That the defendant "seemed to be under the influence of liquor a little bit" was testified to by I. C. Taylor, a witness for the Commonwealth. While this court condemns in unmeasured terms the unwarranted comment of counsel, yet such is the fallibility of mankind that it will not permit the accused to escape just punishment because counsel "wander a little way outside the record."

If an accused has had a fair trial upon the merits of the case and is found guilty by an impartial jury of his peers, he should not be permitted to escape the consequences of his deed by the employment of technicalities.

[24] In *Marshall* v. *Commonwealth*, 140 Va. 541, 125 S. E. 329, it is said: "In *Say's Case*, 135 Va. 737, 115 S. E. 574, Sims, P., quotes with approval from the opinion of Elliott, J., in *Combs* v. *State*, 75 Ind. 215, as follows: 'Courts ought not to reverse cases because counsel, in the heat of argument, sometime * * * * * wander a little way outside the record. If a matter of great materiality is brought into the record as a matter of extended comment, then there would be reason for setting aside the verdict. If every immaterial assertion or statement which creeps into an argument were to be held ground for reversal, courts would be so much occupied in criticising the addresses of advocates as to have little time for anything else.' "

We are of the opinion that there was no error in the judgment of the trial court and it is affirmed.

*Affirmed.*