# Staunton

Mary Ann Banks, Administratrix, Etc. v. Joe Ben. Bradley.

September 5, 1951.

Record No. 3796.

Present, Eggleston, Spratley, Buchanan, Miller and Whittle, JJ.

The opinion states the case.

*S. W. Tucker, Martin A. Martin* and *Robert H. Cooley, Jr.,* for the plaintiff in error.

*L. C. Harrell, Jr.,* for the defendant in error.

MILLER, J., delivered the opinion of the court.

On June 5, 1948, Joe Ben Bradley, a police officer of the town of Emporia, shot and killed Solomon Perry Banks. The homicide occurred about 2:30 o'clock a. m. in the county of Greensville on State Route No. 614, two miles beyond the corporate limits of Emporia.

An action at law under section 8-633, Code, 1950, (sec. 5786, Code, 1942), was instituted by Banks' administratrix against Bradley for the alleged wrongful killing of her intestate. Defendant Bradley asserted that the killing was in self-defense and the case was tried upon that dominant factual issue. To the judgment confirming a verdict which denied recovery to the administratrix, this writ of error was granted.

Plaintiff in error asserts that the evidence did not justify submission of the issue of self-defense to the jury and that the court erred to her prejudice in certain instructions which it gave. The assignment of error which has to do with the sufficiency of the proof requires that the material facts and circumstances preceding and surrounding the tragedy be set out in detail.

Due to recent complaints to the Chief of Police of the town of Emporia that several business establishments had been unlawfully broken into, he issued orders to his officers "to check on cars on streets and alleys in the business district late at nights.".

At 10:00 o'clock p. m., June 4, 1948, Officer Bradley, accompanied by Officer C. W. Young, each attired in police uni-

forms, began an eight hour tour of duty. They occupied one of the police cars owned by the town upon which vehicle was marked and plainly visible the word "Police". About 2:00 o'clock a.m. that night, while cruising through the business section of town, they observed a black Packard sedan occupied by two negro men moving slowly along Halifax Street. The officers drew their car up near the sedan and Bradley, who was driving, sounded the siren signifying that the sedan should be stopped. They intended to check the occupant's driving permit and make such inquiries as they deemed appropriate. Instead of stopping, the driver materially increased the speed of his car, "ran through a stop sign at the intersection of Atlantic Street," and soon attained the excessive speed of "sixty to seventy miles an hour." The officers, with their siren sounding, undertook pursuit to and across the corporate limits and thence into Greensville County. The chase continued along and across numerous State highways, and in various directions until the cars had traveled well outside and beyond the radius of a mile from the limits of the town.

When some two miles from Emporia and traveling at an unlawful speed along Highway No. 301 and with his driving lights turned off at times, Banks undertook to negotiate a turn into Route No. 614 and in so doing, drove into the ditch on the side of that road. The officers who had continued in close pursuit stopped their car on Route 301, with its headlights shining on the Packard sedan, the rear wheels of which the driver was "then spinning" in his endeavor to extricate it from the ditch.

The two officers then approached the standing sedan and undertook to arrest the occupants. Officer Young proceeded to the right side of the car where a man whose name was Andrew Frazier was seated. He encountered no difficulty in effecting "the arrest" of that occupant (but upon what charge does not appear) and Frazier peaceably accompanied him toward the police car. Officer Bradley approached the left side of the sedan and asked the driver "what he was up to" and Banks' reply was, "Nothing." He then told Banks he was under arrest and to get out of the car. Upon his failure to reply or move from his seat at the wheel, the officer opened the left door of the car and took hold of his arm, whereupon Banks resisted and grabbed Bradley "in the collar of his shirt with his left hand, and commenced choking the officer" with that hand and "striking him in the face with his right hand." Bradley thereupon "pulled his

blackjack and attempted to strike back," but as the driver was still in the car, his efforts in that respect were ineffectual. He did not recollect how many blows he struck or whether or not any landed but Banks succeeded in grabbing the blackjack away from him, "and came out of the car fighting." The officer then reached for a set of handcuffs and undertook to put them on decedent, but Banks grabbed them from his hand, struck him across the wrist with the handcuffs, broke his watch and bruised his wrist. Decedent then dropped or threw away the handcuffs and as the encounter continued, he secured a hold around Bradley's neck with his right arm and with his left hand pushed the officer's head back, and with several sharp jerks of the head, caused Bradley to release him. Decedent thereupon released his hold or "broke away and stepped backwards about six or eight feet," and upon the officer calling, "Halt", Banks stopped and "threw his right hand toward his right hip pocket as he made a step forward toward the officer." The officer says that when decedent made that move, he believed "Banks was about to shoot him" and he grabbed his pistol with his right hand from its holster on his left side and fired one shot at decedent. He further said "that his sole reason for shooting was to protect his own life."

Banks, who was found to have had no weapon of any character, was severely wounded by the pistol bullet which struck him in the left mammary region about two inches below the nipple and ranged downward. The officers took the wounded man and his companion to the sheriff's office in the town of Emporia where Frazier was released and no charges placed against either man. A private ambulance was secured and decedent sent to a hospital where he died within an hour or two.

The evidence further discloses that Officer Bradley is five feet nine or ten inches in height, that decedent was about six feet tall, and in the encounter, Bradley's shirt was torn and he received an abrasion on his arm.

■ By Instruction No. 1, the court informed the jury that the officers had no jurisdiction or power to arrest decedent when he was more than a mile beyond the limits of the town of Emporia. That was, we think, correct, for the offenses committed were but misdemeanors. Secs. 2991 and 3006, Code, 1942, now secs. 15-557, 15-560, Code, 1950; *Alexandria* v. *McClary,* 167 Va. 199, 188 S. E. 158; *Wilson* v. *Mooresville,* 222 N. C. 283, 22 S. E. (2d) 907; *Ward* v. *Texas,* 316 U. S. 547, 62 S. Ct. 1139, 86

L. ed. 1663; The Law of Arrest in Civil and Criminal Cases, Voorhees, sec. 142, p. 125; 4 Am. Jur., p. 35, sec. 51; 6 C. J. S., "Arrest", sec. 12(2).

Though the traffic violations were flagrant and committed in the presence of Bradley and Young, those officers, without a warrant, lacked the power or right to effect the arrest of the violator beyond the limit of their jurisdiction which was confined to the town of Emporia or within one mile of its boundary.

"The power of a policeman to make an arrest by virtue of his office is subject to well-recognized territorial limits. He can act only within his city or within one mile of its corporate limits." Secs. 15-557, 15-560, Code, 1950, and *Alexandria* v. *McClary, supra,* at p. 203.[1]

When officer Bradley undertook to arrest decedent some two miles from the town of Emporia, he lacked that authority, and thus, whatever force he used in his attempt to effect the arrest was unlawful. Decedent was entitled to resist the attempted unlawful arrest with such reasonable force as was necessary to repel that being exercised by the officer in his unwarranted undertaking. *Muscoe* v. *Commonwealth,* 86 Va. 443, 448, 10 S. E. 534; Clark and Marshall, Law of Crimes, 4th Ed., sec. 278, p. 348.

That decedent did more than this does not appear from the record. Until the moment that the shot was actually fired, the officer had persisted in his attempt to take decedent into custody. He had first undertaken to remove him from the car and when unsuccessful, resorted to the use of his blackjack. When that proved ineffectual, he then sought to handcuff decedent and in the ensuing encounter, the two men grappled with each other. Yet at no time did the officer forego his attempt to subdue decedent and effect the arrest for when they finally broke apart and decedent stepped back some six or eight feet the officer commanded him to "Halt". The exclamation commonly recognized as one of authority was intended to prevent decedent from leaving the scene. That command discloses that Bradley still sought to effect the arrest and take Banks into custody.

Even though the evidence be viewed in the light most favorable to the officer, as it must be with a verdict and judg-

---

[1] In some instances the jurisdiction and power of arrest of a police officer has been extended. Acts of Assembly of 1950, ch. 338, p. 612, sec. 19-73, 1950 Cumulative Supplement to Code.

ment in his favor, the facts and circumstances do not support a finding that the killing was either justifiable or excusable homicide.

■ The evidence conclusively establishes that the attempted arrest was unlawful and that until the fatal shot was fired, the officer continued his unwarranted attempt to take decedent into custody. At no time before he shot did he desist from this endeavor. Decedent had, immediately before he was shot, withdrawn from the encounter and removed himself a distance of some six or eight feet from the officer when there stopped by the command to "Halt". Though when Banks stopped he did take one step forward and reach toward his hip pocket, the officer had by no act or word or in any manner indicated his withdrawal or desire to withdraw from the encounter that he had wrongfully provoked. Had the officer before the fatal shot was fired withdrawn in good faith from the conflict and disclosed his desire to so terminate the encounter and had deceased then done some overt act which indicated that he intended to continue or resume the conflict and inflict serious bodily harm upon or kill the officer, his killing by the officer would then have been excusable. *Smith* v. *Commonwealth*, 165 Va. 776, 182 S. E. 124; *Harper* v. *Commonwealth*, 165 Va. 816, 183 S. E. 171, and 9 M. J., "Homicide", sec. 43.

Here the officer failed to abandon the encounter in good faith and retreat as was incumbent upon him to do under the circumstances before he could avail himself of the right to kill. Hence, although the act and conduct of decedent may have appeared menacing, it did not excuse the killing. *Sims* v. *Commonwealth*, 134 Va. 736, 115 S. E. 382; *Scott* v. *Commonwealth*, 143 Va. 510, 129 S. E. 360; *Dodson* v. *Commonwealth*, 159 Va. 976, 167 S. E. 260; *Wallen* v. *Commonwealth*, 134 Va. 773, 114 S. E. 786; 6 Va. Law Reg., p. 176; 9 M. J. "Homicide", secs. 4, 42 and 43; 4 Am. Jur., "Assault and Battery" sections 39, 46 and 47, pp. 148, 150, and 151.

If the necessity to kill did in fact reasonably appear to the officer to exist when he shot, that apparent necessity was caused by his unlawful endeavor to effect the arrest, in which undertaking he continued and persisted until the moment of the tragedy. Such a set of circumstances does not justify or excuse the killing.

■ "That 'the law of self defense is the law of necessity and the necessity relied upon to justify the killing must not

arise out of the prisoner's own misconduct,' is a principle too well settled to require the citation of authority to support it.'' *Scott v. Commonwealth, supra,* at p. 516.

The administratrix objected to that part of Instruction No. 2 which allowed the jury to make a finding upon the factual issue of whether or not the officer acted in self-defense. Instruction A also submitted that issue to the jury and she objected to it for the same reason. The specific objection is that the evidence discloses that the officer was at all times the aggressor and there is no evidence tending to show that at any time did he ''withdraw from the combat or retreat.''

■ We have already said that the evidence was insufficient to sustain a finding that the homicide was committed in self-defense. It necessarily follows that the instructions were erroneous and prejudicial in the particular complained of and the objections well taken.

Instruction B, given at the instance of the defendant and over the objection of the administratrix, follows:

''The court instructs the jury that if you believe from the evidence that the defendant, in the circumstances disclosed by the evidence, was justified in shooting Banks, then you must find for the defendant.''

■■ In general terms, it also submits to the jury the issue of whether or not the killing was done in self-defense and for that reason it is amenable to the same objection as were Instructions 2 and A. But had the evidence been sufficient upon which to submit the issue of whether or not the killing was excusable in self-defense the instruction would nevertheless have been too broad. Without guide or limitation it permits the jury to determine whether or not the officer ''was justified in shooting'' decedent. It thus not only allows them to pass upon the weight and sufficiency of factual matter but in addition, permits them to legally determine for themselves what circumstances constitute or measure up to ''justifiable homicide''. In that respect, it was too broad and general and should not have been given.

For the reasons stated, the judgment is reversed and as prayed for by the administratrix, the case is remanded for a new trial to be had not in conflict with the views expressed in this opinion.

*Reversed and remanded.*