# Richmond

EUGENE WELLS v. COMMONWEALTH OF VIRGINIA.

March 13, 1950.

Record Nos. 3542, 3655.

Present, All the Justices.

620

The opinion states the case.

*George P. Cridlin* and *Lloyd M. Robinette*, for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General*, and *H. T. Williams, Jr., Special Assistant*, for the Commonwealth.

BUCHANAN, J., delivered the opinion of the court.

Eugene Wells stabbed and killed J. B. Huff. On his trial before a jury he was convicted of murder in the first degree and sentenced to twenty years in the penitentiary.

On this writ of error he contends first that the verdict was not warranted by the evidence.

Wells and Huff lived in the same neighborhood in Lee county. Wells was twenty-two years old and not in good health. Huff was a year or two younger but bigger and stronger. For some time the relations between them had not been friendly. The evidence shows rather a bullying attitude on the part of Huff toward Wells. Wells testified that about eight months before the killing Huff jumped on him and threw a wine bottle at him because he thought Wells was responsible for the refusal of the latter's sister to "date" him.

On Sunday night, a week before the killing, Huff was in a quarrel with one Garrett. Wells was standing by taking no part. Huff turned his attention to Wells and said, "What have you got to do with it, red shirt?" Wells replied that he had nothing to do with it, whereupon Huff cursed him, started toward him and threatened to hit him with a beer bottle.

Some two or three hours before the killing Huff was at a beer tavern drinking and was heard to say, "Me or Eugene one is going to go down." There is no dispute in the evidence in regard to these previous occurrences.

The killing occurred near the Keokee church around nine o'clock on Sunday night. Wells left his home about dark to go to the church, accompanied by his three younger sisters, Carson Herron, J. B. Herron and some Kelly children. When they arrived at the church the children went inside while Wells and the Herrons stopped in the church yard. A few minutes later Huff came to the church and at or about the same time two of his brothers, Ralph and Mervin, arrived. James Calvin Davidson, the only witness for the Commonwealth who undertook to relate how the killing occurred, testified that when he came to the church he saw the Huff boys and the Wells boy out under a tree. This is his account of what happened then:

"The first I knowed of it, I was standing in front of the

Church house and I saw a crowd out there and the Huff boy told the Wells boy he had been talking about him and he said, 'You cannot do that,' and he hit him with his fist and the Wells boy put his hand up like he was going after a knife and the Huff boy jerked out a pocket knife and told him to draw his knife and we will cut it out. Me and a *Baker* boy were standing there and we told them if they were going to fight to give us their knives and get away from the Church and fight it out. The Huff boy started to give his knife to *Barker* and the Wells boy said he did not have a knife. They had a few more words and a Herron boy and the Wells boy turned and went up the hill."

He further testified that when church was over, perhaps an hour later, he walked away from the church with the crowd, consisting of twenty people or more, including Huff, but he did not see Wells in the crowd or anywhere along the road. He did not see him until "we got on top of the hill," some quarter of a mile from the church, where he heard Huff say to Wells, "What do you aim to do about it now?" Then he "turned around and looked back and about that time I seen the Wells boy cut him." When he looked back, he said, Huff was standing with his back to the witness and facing Wells. He did not see Huff doing anything with his hands; "the best I could see Huff's hand was down by his side." He testified that Wells stabbed Huff but he could not see the knife. He said he was about twenty feet away, he would guess, but it was not too dark and you could see about 100 feet off. He testified that Huff came to him immediately after he was cut and he did not see anything in his hand. He said that Huff was in the crowd leaving the church and the three Wells girls were in front ahead of most of the crowd.

Alethia Huff, the fourteen-year-old sister of deceased, testified that as "we were coming from Church, me and my brothers, and J. B. and Helen Wells and Eugene were together;" that J. B. Huff gave Helen a cigarette, and about that time she saw a dagger behind Wells' back; that she

then knew he was going to stab her brother so she ran to the front to get her other two brothers, and when she got back the cutting had happened. She testified that on the preceding Wednesday, as they were coming from church, Wells had his arm on her shoulder and said, "Here is J. B.'s sister and I am going to kill J. B. and send his soul to hell and laugh while he is dying." She did not tell her brother or anybody about this, she said, because she did not want to tell everything she knew. She admitted on cross-examination that she did not see a knife in Wells' hand on the night of the cutting, but he had his hand behind his back and something was in it; that his back was turned away from her.

Ralph Huff, brother of deceased, testified that he was ahead of Wells in the crowd; that his brother came running by him and said Eugene cut him; that he heard Helen Wells say, "Oh, Lord, you ought not done that;" that he walked on back to Wells and asked him why he had done it and Wells said he did not cut him, that deceased ran into the knife; and then Wells ran off; that he saw a knife in Wells' hand that looked like an army knife. He said that was the first time he had seen Wells that night; that he was eight or nine feet in front of Davidson and did not hear his brother say anything to Wells.

This was all the testimony for the Commonwealth as to what happened on the night of the killing. In addition, an aunt of the deceased testified that some six months before the trouble she heard Wells say he always had despised Huff; and one Jack Smith testified that about three weeks before the killing Wells said to him that Huff and some other boys had been raising a fuss with him and he pulled out a knife from under his shirt and said he was going to settle it with that. He said it was a pointed knife, sharp on both sides, with about a seven-inch blade, something like an army bayonet. Smith said he had knocked Wells down about six months before that (he also said six weeks) over a girl he accused Wells of talking about.

Huff's wound was a cut about three inches long in the

lower abdomen, made with a sharp instrument, which perforated his intestines, and as a result he died four days later.

The defendant claimed that he cut Huff in self-defense. His version was that when he and the Herron boys were in the church yard Huff called Carson Herron to him, showed him an open knife and told Herron he was going to whip Wells. He then came over to Wells and asked him why he had been lying about him. Wells said he had not and Huff then cursed him, struck him in the face with his fist and said, "Do you think I will not cut your head off and roll it over the hill?" Wells did not resist, and Huff's brother, Mervin, standing by said, "Leave that boy alone, he has done nothing to you." Wells then walked over to J. B. Herron and together they left the church, "to keep him from bothering us," said Wells. Wells was fully corroborated as to this occurrence by the two Herron brothers. There is no contradiction of it in the Commonwealth's evidence. In fact, Davidson, main Commonwealth's witness, testified to practically the same thing.

Neither of the Herron boys saw the cutting, they testified. J. B. Herron said that when Wells came over to him after being struck by Huff, he and Wells walked down the road to a place referred to by others as "the cut." They were there waiting for Wells' sisters when the crowd from the church came along. After Huff had passed by, Herron said he went toward the front of the crowd to get some matches and was there when the cutting occurred. On his way up to the front, he testified, Huff passed him going back toward Wells.

Wells testified that after his sisters came to where he was waiting for them, Huff came along and as Huff went up the road he heard him say, "Let's have a free for all and if there is a free for all there will be nobody left but me and my buddies." Wells did not see him any more, he said, until he got to the top of the hill. There Huff "come meeting me and said, 'All right, Eugene, I am going to kill you. Have you got that knife?' I said, 'Even if I have, I don't want

to have any trouble.' About that time he struck at me with his knife and I throwed my hand up like this (indicating) and the knife grained my hand. I tried to run—I didn't want to have any trouble—and he grabbed me by the shoulder and put his knife to my neck and said, 'O. K. I have you this time.' I had my knife in my right front pocket and I pulled it out and struck him." He added, "I done it to keep him from cutting my head off. I knew he was going to do just what he said he was."

He was corroborated in this account of the matter by his three sisters. There was also evidence that some three hours prior to the cutting Huff, with an open knife, six or seven inches long, visible in his pocket, compelled a man to buy beer for him, and upon concluding this matter he took the knife out, closed it and put it back in his pocket.

■■ Upon careful study of this evidence we conclude that it falls short of establishing a willful, deliberate and premeditated killing, necessary to constitute first-degree murder. Code, 1950, sec. 18-30.

To constitute first-degree murder the killing must have been willed, premeditated and deliberated. This does not mean that the intent to kill must have existed for any particular length of time prior to the actual killing, but there must be proof beyond a reasonable doubt that it was a willful, deliberate and premeditated act. *Carson* v. *Commonwealth*, 188 Va. 398, 410-11, 49 S. E. (2d) 704, 709. It must be "a pre-determined killing upon consideration, and not a sudden killing upon the momentary excitement and impulse of passion, upon provocation given at the time, or so recently before, as not to allow time for reflection;" and the death of the deceased must be "the ultimate result which the concurring will, deliberation and premeditation of the prisoner sought." *McDaniel* v. *Commonwealth*, 77 Va. 281, 284, 286. *Williams* v. *Commonwealth*, 128 Va. 698, 716, 104 S. E. 853, 859; *Pannill* v. *Commonwealth*, 185 Va. 244, 255, 38 S. E. (2d) 457, 463.

Without contradiction the evidence shows that the deceased was drinking and that the defendant was sober on the night of the killing. There is evidence of a reckless, aggressive disposition of the deceased, and of his threatening manner shortly before he was killed. It is shown that within an hour or less prior to the killing the deceased made an unprovoked assault on the defendant, jerked out his knife and invited defendant to cut it out with him. It is not contradicted that the defendant did not resist that attack, but went away to prevent further trouble. The facts and circumstances shown by the evidence negative rather than establish deliberation and premeditation preceding the killing. While there was evidence of dislike and statements that might be taken as threats on the part of the defendant, expressed some time before the fatal night, yet the occurrences of that night up to the time of the actual killing, gave no evidence of a purpose to kill, notwithstanding the assault the deceased made on the defendant. The fact that he previously armed himself with the knife he carried, in the light of the other evidence, suggests a fear of the deceased as readily as a purpose willfully to kill him.

The evidence of Davidson is not sufficient to show that the killing was an unprovoked and premeditated act. The first time that he knew Wells was around was when he heard Huff say, "What do you aim to do about it now?" He then turned around and looked back and saw Wells cut him. He was then twenty feet away, he guessed, and it was night, although he said it was not too dark. Huff's back was to him, and "the best I could see," he said, "Huff's hand was down by his side." He did not see the knife in Wells' hand. That evidence, together with all the other evidence introduced by the Commonwealth, is not sufficient to require us to reject the evidence for defendant as to what occurred in addition to what Davidson said he saw.

In *Thomason* v. *Commonwealth*, 178 Va. 489, 17 S. E. (2d) 374, a witness for the Commonwealth testified that when the deceased was struck by the defendant, the de-

ceased "wasn't doing anything that I know of, just standing there on the platform;" and another witness testified that just as he glanced back he saw the defendant strike at the deceased. We said that it was entirely possible that these two witnesses may not have seen the overt act of the deceased which the defendant said preceded the blow; and further, that "there is nothing inherently incredible in Thomason's story. In the main it is not contradicted by any witness. Hence, we cannot agree that the jury had the right to totally disregard it." 178 Va. at page 496-7, 17 S. E. (2d) at p. 377.

The defendant testified he had never been in any trouble before and introduced evidence of his good character, one of his witnesses testifying that "he has been a good boy all his life." He assigns as error the refusal of the court to give his Instruction D-11, to the effect that proof of good character may generate a reasonable doubt of guilt. In its place the court gave D-11a, to the effect that proof of good character is to be considered along with other evidence. There was no error in this ruling. See *Randolph* v. *Commonwealth, ante,* p. 256, 266, 56 S. E. (2d) 226, 231, and cases there cited.

The remaining assignment of error is to refusal of the court to set aside the verdict for after-discovered evidence, consisting of affidavits showing threats by the deceased against the life of the defendant, and one to the effect that the deceased left the front of the group and went back down the road to where the defendant was. In view of our conclusion on the evidence it is unnecessary to rule on this assignment.

We hold that the evidence presented in this record was insufficient to warrant the conviction of first-degree murder. The judgment below is therefore reversed and the case is sent back for a new trial.

*Reversed and remanded.*