# Richmond

JODIE BAILEY v. COMMONWEALTH OF VIRGINIA.

November 27, 1950.

Record No. 3753.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley, Buchanan and Miller, JJ.

512

The opinion states the case.

*S. W. Tucker* and *Martin A. Martin*, for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General*, and *Frederick T. Gray, Assistant Attorney General*, for the Commonwealth.

BUCHANAN, J., delivered the opinion of the court.

L. P. Brockwell, Sr., service manager of a garage in Greensville county, was killed as the result of a stab wound which entered his heart, inflicted by the defendant, Bailey. A jury convicted Bailey of first-degree murder, fixed his punishment at life imprisonment and he was sentenced accordingly. He contends here that the trial court erred in overruling his motion to quash the *venire*, and that the evidence was not sufficient to support a conviction of murder in the first degree. We shall look first to the sufficiency of the evidence, viewed in the light most favorable to the Commonwealth, the jury's verdict having settled the conflicts.

Brockwell was a large white man six feet, three inches tall and weighing 200 pounds. Bailey was a small Negro, five feet, four inches tall and weighing 108 pounds. On the afternoon of the difficulty Bailey came to the garage to get a car belonging to his father-in-law which had been left there for repairs. He was drinking but not drunk. He entered the garage and went to Brockwell's desk, saying he had come to get the car and "he was going to ride tonight." Brockwell called his son, B. G. Brockwell, and told him to add up the bill and let Bailey know what it was. When that was done Bailey questioned the amount. Young Brockwell told him he would have to pay the bill or wait until the insurance man came the following Tuesday. Bailey's reply was, "You all are nothing but a bunch of white crooks." Brockwell reported this conversation to his father. While he was doing so Bailey came up and threw a check down, stating that was all he was going to pay. L. G. Brockwell told him to come back Tuesday, whereupon Bailey put the check in his pocket and was "mumbling and mouthing" about white crooks. There was a boy with him who tried to get Bailey to go on out.

In checking the bill for repairs B. G. Brockwell took Bailey to see the parts manager in the show room. The latter gave Bailey a list of the necessary parts, told him what the bill would be and advised him to wait until Tuesday when the adjuster would be there so the car could be

fixed right. Bailey replied that "he was going to ride that night regardless."

After L. P. Brockwell told Bailey he could not get the car, a colored employee at the garage talked to Bailey and told him to go on out. Bailey did not go but kept on talking about the car, saying, "The whole bunch is a bunch of crooks." The colored boy testified that Brockwell then said, "I have done took enough," went over to Bailey and hit him; that they were fighting or "scuffling," got outside, and he couldn't say what happened then. This witness told the chief of police, however, three days after the killing, that after Bailey said the whole outfit was a bunch of crooks, Brockwell got up and pushed Bailey out of the door and that was all he saw.

Other witnesses, five of them, who saw the encounter, or parts of it, testified that Brockwell was at his desk when Bailey, with his hands in his pockets, was saying that there was a bunch of white crooks there; that Brockwell got off his stool, told him he had better go on out and started to shove his shoulder, whereupon Bailey began striking him. One witness said that Brockwell was standing at his desk with his hands at his sides when Bailey struck him, whereupon Brockwell caught Bailey by the shoulder and shook him and then proceeded as if to push him out. They then disappeared behind a truck which was parked at the door of the garage, and when they next came into view Bailey made a lunge at Brockwell with a knife and struck him in the chest.

Following that, the son stepped between them, not knowing his father had been cut. The son struck or struck at Bailey, who then "started as if he was going," but stopped about the middle of the street and looked back. He then had a knife in his right hand which he shifted to the palm of his hand with the blade up and put it in his pocket.

Brockwell, in the meantime, not realizing that he had been seriously injured, came back to his desk and started to work. When it was seen he was bleeding, a doctor was

summoned but Brockwell died about five minutes after the doctor arrived.

In addition to the stab wound in his heart there was a stab wound in his left side and an abrasion below his left rib. There was also a distinct scratch on his belt five or six inches long, made by a sharp cutting instrument.

The defendant had no wounds and showed no bruises. His version was that in questioning the repair bill he said, "It looks like a clique." Then he turned his head and Brockwell hit him on the back of the neck; that he fell and then Brockwell kicked him in the groin; that as he was trying to go out into the street Brockwell was behind him, beating him, "and then I—well, I struck him." He said he took his knife out while Brockwell was behind him beating him; that he was not angry enough to want to hurt anybody. His attorney asked him, "But at the time you took your knife out were you afraid?" He replied, "Yes, sir."

Later that day Bailey told the sheriff that he did not own or carry a knife and again the next day he repeated to the sheriff that he did not have a knife and stated that he did not cut Brockwell.

Whether Bailey was guilty of murder in the first degree was a question for the jury under the evidence as they had a right to view it and the inferences they had a right to draw from it.

A willful, deliberate and premeditated killing is murder in the first degree. Code, 1950, sec. 18-30. It must be a predetermined killing upon consideration, and not a sudden killing done in the momentary excitement and impulse of a passion which was engendered by adequate provocation. *Wells* v. *Commonweath*, 190 Va. 619, 625, 57 S. E. (2d) 898, 900.

But that does not mean that a measurable period of time for pondering must have elapsed. The intention to kill may have come into being only at the time of the killing and the act still be first-degree murder. It is the will and purpose to kill and not the interval of time which fixes the grade of

the offense. *Mosby* v. *Commonwealth*, 168 Va. 688, 694, 190 S. E. 152, 154; *Bryan* v. *Commonwealth*, 131 Va. 709, 716, 109 S. E. 477, 479; *Wright* v. *Commonwealth*, 75 Va. 914, 920.

"To constitute a willful, deliberate and premeditated killing, it is not necessary that an intention to kill should exist for any particular length of time prior to the actual killing; it is only necessary that such intention should come into existence for the first time at the time of such killing or any time previously." *Wright* v. *Commonwealth*, 33 Gratt. (74 Va.) 880, 893. *Bradshaw* v. *Commonwealth*, 174 Va. 391, 398, 4 S. E. (2d) 752, 755; 9 M. J., Homicide, sec. 21, p. 362.

It is an established principle of our criminal law that a mortal wound given with a deadly weapon in the previous possession of the slayer, without any, or upon very slight provocation, is *prima facie* willful, deliberate and premeditated killing, and throws upon the accused the necessity of proving extenuating circumstances. *Scott* v. *Commonwealth*, 143 Va. 510, 518, 129 S. E. 360, 363.

Whether the evidence in this case showed such extenuating circumstances was peculiarly within the province of the jury to decide. *Bryan* v. *Commonwealth, supra.*

Because of the offensive language of the defendant, the deceased had a right to request him to leave the premises, and upon his refusal to do so, the further right to remove him by reasonable force. *Montgomery* v. *Commonwealth*, 98 Va. 840, 842, 36 S. E. 371, 372; 6 C. J. S., Assault and Battery, sec. 94, p. 952; 4 Am. Jur., *Id.*, sec. 70, p. 165.

There was evidence that the defendant struck first; in any event there was evidence to support a finding that the deceased used no more force than was reasonably necessary. Either in making the initial assault or in refusing to yield to a lawful effort to eject him, the defendant was the aggressor. The announced purpose of the defendant, in demanding his automobile, "to ride regardless;" his repeated insults spoken while he kept his hands in his pockets where

he had his knife; his refusal to leave the premises and his resort to a deadly weapon to resist being ejected in a reasonable manner and without physical harm to him, coupled with his readiness to inflict death, made it a question of fact for the jury, and not a question of law for the court, whether there was any provocation for the killing, or too slight provocation to amount to extenuating circumstances. *Scott v. Commonwealth, supra; Honesty v. Commonwealth*, 81 Va. 283, 292; *Thomas v. Commonwealth*, 186 Va. 131, 139, 41 S. E. (2d) 476, 480; *Sims v. Commonwealth*, 134 Va. 736, 762, 115 S. E. 382, 390; *Howell v. Commonwealth*, 26 Gratt. (67 Va.) 995, 1006-7; *Mitchell v. Commonwealth*, 33 Gratt. (74 Va.) 872; 9 M. J., Homicide, sec. 40, p. 378 ff.

The grade of the defendant's crime being a question for the jury, it was essential that the jury which tried him be properly constituted. The defendant filed a written motion to quash the *venire facias* on the ground that his right to the equal protection of the law, secured to him by the Fourteenth Amendment of the United States Constitution, had been violated, in that there had been discrimination against colored persons, solely because of their race, in the selection of the jurors summoned for his trial.

He alleged, in substance, that according to the United States census in Greensville county more than 50 per cent. of the male persons twenty-one years old and upwards were colored, approximately one-half of whom were qualified for jury service; that for more than thirty years only white persons had been appointed as jury commissioners, whose acquaintance with and information about qualified jurors was, "with negligibly few exceptions," limited to white persons; that an order was entered in June, 1935, and like orders subsequently, directing the jury commissioners to add to the jury lists qualified colored jurors in number bearing some proper relation to the number in the county qualified to serve; that notwithstanding said orders, out of approximately 700 persons summoned for jury duty since 1935, only 16 had been colored persons; that following a custom which

had prevailed for more than thirty years, and "at all times material," the jury commissioners had willfully failed and refused to place a proper number of colored persons on the jury lists; that only once in thirty years had as many as five colored persons been summoned for jury service, and at no other term had more than two been so summoned. It was alleged that two were included among those summoned for the trial of this defendant.

It was futher charged that for more than thirty years no colored person had been sworn as a member of a petit jury, and the only time in that period that a colored person had been summoned on a grand jury was at the present term, when one was a member of the grand jury which found the indictment against this defendant; that for more than thirty years there had been within the county a systematic and intentional practice to exclude persons from service on petit juries solely because of their race.

Defendant's counsel stated that he was prepared to offer evidence in support of the allegations of this motion "and propose(s) to do so except as to those, if any, of which the Court will take judicial notice, or which the Commonwealth will concede to be true." Thereupon the Commonwealth's attorney stated that the Commonwealth denied each and every allegation of the motion and asked that the court overrule it.

The court stated that if there was any evidence the defendant wanted to introduce "with reference to the drawing and the summoning of the jury for the trial of this case, the Court would particularly like to hear it;" that the judge was present at the drawing of the jury for the trial of this case and that no person had been excluded or included by reason of race or color; that there had not been any discrimination in drawing, summoning or empanelling persons of the Negro race, or in the selection and appointment of jury commissioners since he assumed the office of judge in 1943.

Counsel for defendant stated that he was not in a position

to present evidence as to what happened on the day this panel was drawn, but "we are in position to offer evidence and here offer to present evidence supporting each of the allegations that have been spelled out in the written motion;" that such evidence would be "to show what the system had been over the period of thirty or more years, and to show that the result of such system is that to this date no Negro has been sworn as a member of a petit jury in this Court in the last thirty years. We would like to ask the Court if we may be permitted to offer such evidence as that?"

The court replied that so far as this trial was concerned it was not a matter of whether persons of the Negro race had served as jurors in years gone by or in other cases. The motion to quash was thereupon overruled.

In *Clark* v. *Commonwealth*, 167 Va. 472, 473, 189 S. E. 143, 144, we said:

"The Supreme Court of the United States has settled beyond controversy the proposition that the exclusion of all negroes from the grand jury by which a negro is indicted, or from the petit jury by which he is tried, solely because of their race or color, is a denial of the equal protection of the laws guaranteed to him by the Fourteenth Amendment to the Federal Constitution. *Norris* v. *Alabama*, 294 U. S. 587, 589, 55 S. Ct. 579, 79 L. ed. 1074, and cases there cited."

Jurors should be selected as individuals, on the basis of individual qualifications, and not as members of a race. Proportional representation of race is not a constitutional requisite. The Constitution requires only a fair jury, selected without regard to race. "An accused is entitled to have charges against him considered by a jury in the selection of which there has been neither inclusion nor exclusion because of race." *Cassell* v. *Texas*, 339 U. S. 282, 287, 70 S. Ct. 629, 632, 94 L. ed. 563, 568. "But discrimination in this context means purposeful, systematic non-inclusion because of color." The command of the Constitution is "that no State purposefully make jury service turn on color."

Concurring opinion, *Idem*, 339 U. S. at p. 291, 70 S. Ct. at p. 634, 94 L. ed. at p. 570.

"The defendant's right is a neutral jury. He has no constitutional right to friends on the jury." *Fay* v. *New York*, 332 U. S. 261, 289, 67 S. Ct. 1613, 1628, 91 L. ed. 2043, 2060.

The mere showing that a class was not represented in a particular jury is not enough; "there must be a clear showing that its absence was caused by discrimination, and in nearly all cases it has been shown to have persisted over many years. * * * Also, when discrimination of an unconstitutional kind is alleged, the burden of proving it purposeful and intentional is on the defendant." *Fay* v. *New York, supra*, 332 U. S. at p. 284, 67 S. Ct. at p. 1626, 91 L. ed. at p. 2058.

In *Patton* v. *Mississippi*, 332 U. S. 463, 464, 68 S. Ct. 184, 185, 92 L. ed. 76, 78, 1 A. L. R. (2d) 1286, 1288, the conviction of a Negro for murder was reversed for overruling a motion to quash the indictment. "In support of his motion petitioner introduced evidence which showed without contradiction that no Negro had served on the grand or petit criminal court juries for thirty years or more." It was there said that the State Supreme Court "erroneously considered only the fact that no Negroes were on the particular venire lists from which the juries were drawn that indicted and convicted petitioner. It regarded as irrelevant the key fact that for thirty years or more no Negro had served on the grand and petit juries." 332 U. S. at p. 466, 68 S. Ct. at p. 186, 92 L. ed. at p. 79. This also was said in that case:

"It is to be noted at once that the indisputable fact that no Negro had served on a criminal court grand or petit jury for a period of thirty years created a very strong showing that during that period Negroes were systematically excluded from jury service because of race. When such a showing was made, it became a duty of the State to try to justify such an exclusion as having been brought about for

some reason other than racial discrimination. The Mississippi Supreme Court did not conclude, the State did not offer any evidence, and in fact did not make any claim, that its officials had abandoned their old jury selection practices."

In that case evidence was introduced. In this case there was no actual introduction of testimony and the attorney general argues that under our holding in *Scott* v. *Commonwealth, ante*, p. 73, 60 S. E. (2d) 14, the defendant is now precluded from relying on his motion. That case does not meet the situation involved here. There it was contended that the trial court was without jurisdiction, but there was nothing to support the claim save "the argument and objection and contention of counsel." There was no evidence in the record, and the defendant "proffered no such evidence and he failed to avouch his evidence in the record or to press his case." *Ante*, p. 78, 60 S. E. (2d) at p. 16. Here the defendant stated he was in a position to offer evidence "and here offer(s) to present evidence" to support the allegations of his motion, and to show "that to this date no Negro has been sworn as a member of a petit jury in this Court in the last thirty years." Such evidence was referred to as "the key fact" in the *Patton Case, supra*. The willingness of the trial court to hear evidence on the motion was limited to "the drawing and summoning of the jury for the trial of this case." The gravamen of the charge here was that the discrimination occurred prior to the drawing; *i. e.*, in the making up of the jury lists by the commissioners.

 While the ultimate issue was whether there had been discrimination in the selection of the jury for the trial of this defendant, the evidence offered was admissible, though not necessarily conclusive, on that point. *Patton* v. *Mississippi, supra*. "Since the issue must be whether there has been discrimination in the selection of the jury that has indicted petitioner, it is enough to have direct evidence based on the statements of the jury commissioners in the very case. Discrimination may be proved in other ways than by evidence of long continued unexplained absence of Negroes from

many panels." *Cassell* v. *Texas, supra,* 339 U. S. at p. 290, 70 S. Ct. at p. 633, 94 L. ed. at p. 570.

*Martin* v. *Texas,* 200 U. S. 316, 26 S. Ct. 338, 50 L. ed. 497, affirmed the overruling of motions to quash the indictment and the panel, made on the ground of discrimination, because the accused introduced no evidence and made no actual offer of evidence in support of his motions. But the court said that if the facts alleged had been established by affirmative proof, "or if the trial court had refused to admit evidence to prove them, we should not hesitate to reverse the judgment." See also, *Carter* v. *Texas,* 177 U. S. 442, 20 S. Ct. 687, 44 L. ed. 839; *Patterson* v. *Commonwealth,* 139 Va. 589, 123 S. E. 657; Anno. to *Patton* v. *Mississippi, supra,* 1 A. L. R. (2d) 1291, at p. 1297.

Since the issue is whether this defendant was tried by "a fair jury selected without regard to race," *Cassell* v. *Texas, supra,* the allegations in the motion to quash that only white persons have been appointed jury commissioners are not relevant. Appropriate sections of the Code require that each year the judge appoint not fewer than two nor more than five jury commissioners, competent to serve as jurors and citizens of "intelligence, morality and integrity." It is the duty of these jury commissioners to prepare a list of persons well qualified to serve as jurors, which list shall be delivered to the clerk and each name thereon written on a separate ballot and the ballot deposited in the jury box. Code, 1950, secs. 8-180, 8-182, 8-183, 8-184, 8-188, 19-173.

In making their list of qualified jurors the jury commissioners are required by Constitution and Federal statute to do so without regard to race. *Cassell* v. *Texas, supra,* 339 U. S. at pp. 286-7, 70 S. Ct. at pp. 631-2, 94 L. ed. at p. 568.

The statutory qualifications of the persons whom the court shall appoint to perform these duties are not related to race or color. If they perform them as required by law, a fair jury free of constitutional defect may be selected, and that is all a defendant is entitled to demand.

We hold that there was a sufficient offer of relevant

evidence that there was discrimination in the selection of the jury for the trial of the defendant; that the failure to receive it was prejudicial error for which the judgment of conviction must be reversed and the case remanded for a new trial. *Patton* v. *Mississippi, supra,* 332 U. S. at p. 469, 68 S. Ct. at p. 187, 92 L. ed. at p. 80; *Hill* v. *Texas,* 316 U. S. 400, at p. 406, 62 S. Ct. 1159, at p. 1162, 86 L. ed. 1559.

*Reversed and remanded.*