# Richmond

## Jodie Bailey v. Commonwealth of Virginia.

June 16, 1952.

Record No. 3973.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Miller and Whittle, JJ.

The opinion states the case.

*S. W. Tucker* and *Robert H. Cooley, Jr.,* for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General* and *Frederick T. Gray, Assistant Attorney General,* for the Commonwealth.

BUCHANAN, J., delivered the opinion of the court.

Bailey, the defendant, stabbed and killed L. P. Brockwell, Sr. He was indicted for murder at the December, 1949, term of the circuit court. On his arraignment on January 3, 1950, he filed a written motion to quash the writ of *venire facias* on the ground of racial discrimination in the selection of the jurors summoned for his trial, the defendant being a Negro and the deceased a white person. This motion was overruled. He thereupon entered a plea of not guilty, was tried, convicted of first-degree murder and sentenced to life imprisonment. On appeal to this court we held that the evidence was sufficient to support the verdict but that the trial court erred in not receiving proffered evidence that there was discrimination. The judgment of conviction was for that reason reversed and the case remanded for a new trial. *Bailey* v. *Commonwealth,* 191 Va. 510, 62 S. E. (2d) 28, decided November 27, 1950.

Upon the calling of his case on April 17, 1951, for retrial, the defendant moved to withdraw his plea of not guilty and to file a plea in abatement to the indictment, but the court overruled his motion and rejected the plea. He then filed a written motion to quash the writ of *venire facias* on the ground of racial discrimination in the selection of the jurors for this trial, and after hearing the evidence the court overruled that motion. Thereupon a jury was selected, heard the evidence, found the defendant guilty of murder in the first degree, fixed his punishment at life imprisonment, and he was sentenced accordingly.

On this appeal he charges that the court erred in its ruling on his two motions, in refusing to amend the indictment to lower the charge to manslaughter, in giving and refusing instructions, in refusing to declare a mistrial for improper argument by the Commonwealth's attorney, and in refusing to set aside the verdict as contrary to the law and the evidence.

█ First. The plea in abatement, omitting the formal parts, is copied in the margin.* It was rejected because it was not

---

* 1. That he, said Jodie Bailey is a colored person; that of the seven men who constituted the Grand Jury which attended this Court at its December 1949 Term and presented said indictment, only one was a colored man; and that for more than thirty years next preceding said December 1949 Term no colored person had been summoned and impaneled as a grand juror in said County of Greensville.

timely filed. It was conceded that at the former trial the indictment was not challenged in any way. It was further conceded that when the former motion to quash the *venire facias* was filed the defendant then had full knowledge of the matters alleged in the plea in abatement, and that all the facts were in his possession at the time of the first trial. Under the settled practice of this jurisdiction it was his duty to make his objection known at the first trial, and whether he should be allowed to withdraw his plea of not guilty then entered and file a plea in abatement was within the sound discretion of the trial court.

■ In *Early* v. *Commonwealth*, 86 Va. 921, 11 S. E. 795, in which defendant was sentenced to be hanged, when the case was called for trial the defendant moved to withdraw his plea of not guilty entered at a former term and to enter a plea in abatement on the ground that the grand jury had not been summoned according to law. It was held not error to refuse the request, the court saying:

"By pleading the general issue alone, a defendant has always been understood to waive the right to interpose afterwards a plea in abatement. The settled doctrine, however, is that the judge may permit a pleading to be withdrawn, and another one to be substituted, whenever by so doing he does not violate any positive rule of law or of established practice. But such a discretion will rarely, if ever, be exercised in aid of an attempt to rely upon a merely dilatory or formal defence. 1 Bish. Crim. Proc. (2d ed.), sec. 124." 86 Va. at p. 924, 11 S. E. at p. 796.

■ In *Curtis* v. *Commonwealth,* 87 Va. 589, 13 S. E. 73, a verdict of first-degree murder was set aside by the trial court. On his retrial the defendant moved to quash the indictment.

---

2. That now and at all times during more than thirty years next preceding there are and have been more colored adult male citizens than white adult male citizens residing within each of the three Magisterial Districts of said County.

3. That for more than thirty years next preceding there has prevailed and does yet continue a custom, practice, policy and usage wilfully, deliberately arbitrarily, and systematically to discriminate against and to exclude colored persons in the selection of grand jurors in said county, solely by reason of race.

4. That, pursuant to said custom, practice, policy and usage, the Judge of this Court and the Clerk of this Court purposefully limited to one the number of colored persons to be impaneled on the grand jury which presented said indictment.

5. That any proceeding against said Jodie Bailey had upon said indictment presented by said grand jury so selected, summoned, and impaneled, would constitute a denial to Jodie Bailey of due process of law and of the equal protection of the laws in violation of the Fourteenth Amendment to the Constitution of the United States.

This court approved the overruling of the motion, saying: "(I)t is well settled that objections to the mode of summoning a grand jury, or to the disqualifications of particular jurors, must be made at a preliminary stage of the case, that is, before a plea to the merits; otherwise they will be considered as waived, unless, indeed, the proceeding be void *ab initio.*" 87 Va. at p. 592, 13 S. E. at p. 74.

It was there said that the defendant, upon his arraignment, had pleaded not guilty, upon which plea alone the trial was had, and when the first verdict was set aside and a new trial awarded, the case was in the same situation as when the first trial began; "that is to say, all the proceedings subsequent to the joinder of issue on the plea having been set aside, the Commonwealth and the prisoner were at issue on the plea of not guilty;" and to say that the granting of a new trial expunged the plea "is to assert a proposition not founded in reason, and one that has never been recognized in any jurisdiction where the rules and practice of the common law prevail." 87 Va. at pp. 593-4, 13 S. E. at p. 74.

The rule announced in those cases has been consistently followed in succeeding cases. *Watson* v. *Commonwealth,* 87 Va. 608, 13 S. E. 22; *Reed* v. *Commonwealth,* 98 Va. 817, 36 S. E. 399; *Pflaster* v. *Commonwealth,* 149 Va. 457, 141 S. E. 115; *Parris* v. *Commonwealth,* 189 Va. 321, 52 S. E. (2d) 872. And such appears to be the rule generally. *Mack* v. *State,* 203 Ind. 355, 180 N. E. 279, 83 A. L. R. 1349; *State* v. *Twine,* 211 Iowa 450, 233 N. W. 476; *State* v. *Ritter,* 199 N. C. 116, 154 S. E. 62; Anno., 145 A. L. R. 493; *Tyson* v. *State,* 146 Tex. Cr. R. 128, 171 S. W. (2d) 496; *Robinson* v. *Commonwealth,* 285 Ky. 838, 149 S. W. (2d) 502; 22 C. J. S., Criminal Law, § 429, p. 672; 14 Am. Jur., Criminal Law, § 289, p. 964; 2 Wharton's Crim. Proc., 10 ed., § 1354, p. 1813.

Defendant argues that racial discrimination in the selection of grand jurors is prohibited by the Fourteenth Amendment, as well as by Federal statute, and that the right to object to it at any time cannot be waived. It is not questioned that the defendant had a constitutional right to a fair and impartial grand jury from which members of his race had not been intentionally excluded. *Cassell* v. *Texas,* 339 U. S. 282, 70 S. Ct. 629, 94 L. ed. 839; *Bailey* v. *Commonwealth,* 191 Va. 510, 62 S. E. (2d) 28. But that does not mean that there is no limitation of

time, mode or circumstance upon his right to object to the grand jury which returned the indictment against him. The right to a proper grand jury is guaranteed to him, but that guaranty does not preclude his acceptance of the grand jury in his particular case as meeting that requirement. Here he knew there was a member of his race on the grand jury; he admits that all the facts were in his possession at the time the case was tried before; notwithstanding, he gave no indication to the court that he questioned the composition of the grand jury, but went to trial on his plea of not guilty, and appealed his conviction to this court still without objection to the indictment. His contention now is that all of that was useless procedure and that he should not have been tried at all. We hold his objection was not timely and that his plea in abatement was too late. To use the language of the Supreme Court in *United States* v. *Gale,* 109 U. S. 65, 3 S. Ct. 1, 27 L. ed. 857, 859, cited in the *Curtis Case, supra,* to allow such procedure "would be trifling with justice, and would render criminal proceedings a farce."

In the *Gale Case* four persons, otherwise competent, were excluded from the grand jury for causes "mentioned in section 820 of the Revised Statutes," but no objection was taken to the indictment on that account until after a plea of not guilty and a conviction. The court said:

"The second question, as to the constitutionality of the 820th section of the Revised Statutes, which disqualifies a person as a juror if he voluntarily took any part in the rebellion, is not an essential one in the case; inasmuch as, by pleading not guilty to the indictment and going to trial without making any objection to the mode of selecting the grand jury, such objection was waived." 27 L. ed. at p. 858.

The court further said that its discussion as to the time for objecting to the indictment applied with additional force where the objection is not to the disqualification of the jurors actually on the panel "but to the exclusion or excuse of persons from serving on the panel. * * * No complaint is made that any of the grand jurors who found the indictment were disqualified to serve, or were in any respect improper persons. It is only complained that the court excluded some persons for an improper cause, * *. But passing by these proper modes of taking the objection, they waited until they had been tried and convicted

on a plea of not guilty, and then moved in arrest of judgment. We think they were too late in raising the objection." 27 L. ed. at p. 859.

In the recent case of *Stroble* v. *California,* 343 U. S. 181, 72 S. Ct. 599, 96 L. ed. 529, decided April 7, 1952, Mr. Justice Frankfurter, dissenting from the affirmance, said of defendant's claim that his conviction lacked fundamental fairness because of misconduct of the district attorney and consequently offended the Due Process Clause of the Fourteenth Amendment: "The issue was raised after verdict, and the Supreme Court of California might have disposed of the claim by ruling that it had not been made at the stage of the proceeding required by State law."

There is no constitutional requirement in Virginia that prosecutions for felony be by indictment. The requirement is only statutory and may be waived. *Livingston* v. *Commonwealth,* 184 Va. 830, 36 S. E. (2d) 561; Code 1950, § 19-133. If a defendant may legally waive an indictment and be tried for a felony without any indictment at all, it seems clear that his constitutional rights are not violated by requiring that if he questions the validity of an indictment that is made he shall do so before he goes to trial on a plea of not guilty and is convicted.

Second. Defendant next contends that the court abused its discretion in refusing to allow the defendant to withdraw his plea of not guilty and to plead in abatement to the indictment. We find no real basis for this contention. There had been one trial before the same judge on full evidence. He had held that evidence to be sufficient to convict the defendant of first-degree murder. This court had sustained that holding. He could hardly overlook the improbability that any grand jury composed of qualified jurors would refuse to indict the defendant for murder. He had himself, pursuant to section 19-123 of the Code, selected the list of grand jurors from which this grand jury had been summoned. It is to be presumed that he obeyed the statutory injunction to select only men of "honesty, intelligence and good demeanor and suitable in all respects to serve as grand jurors." The failure of the defendant in possession of all the facts to object at the proper time, strongly supported the conclusion that his plea was without real merit. Abuse of discretion is not to be predicated on following the established procedure under the circumstances of this case.

Third. The defendant assigns error to the overruling of his

motion to quash the writ of *venire facias* for racial discrimination in selecting and summoning the trial jury, and to disallowing certain questions on cross-examination of Commonwealth's witnesses on the subject.

In support of his motion to quash the *venire,* one of defendant's counsel, who had lived in Greensville county since 1946, testified as to census figures on white and colored population of the county 21 years of age and over for 1930 and 1940; that for 1940 the numbers of such persons were: Native white male, 1719; foreign born, 54; Negro male, 2048; female native white, 1677; foreign born, 37; Negro, 1977; and that he knew of no reason why the 1950 census would show a materially different ratio of white to colored; that since June, 1935, and up to the term next preceding the then present term, approximately 840 persons had been called for petit jury service, and that based on his knowledge and information which he had received as to racial identity, all of them had been white except 21; that on the writ of *venire facias* issued for this trial only six colored persons were included. He stated that his investigation would not be accurate as to persons on the jury list, Code 1950, § 19-173, but not summoned, Code 1950, § 19-171.

In opposition to the motion to quash, the Commonwealth introduced written instructions dated February 1, 1951, given by the court to the jury commissioners appointed by it, Code § 8-180, to prepare the list of jurors for 1951, from which list the jurors for this trial were afterwards selected. These instructions reminded the commissioners of their oath and instructed them as to their duties. The commissioners were specifically told of the holdings of this court that jurors should be selected as individuals, on the basis of their qualification as individuals, and not as members of a race, as well as of the holdings of the Supreme Court of the United States that exclusion of Negroes because of color is a denial of due process of law.

There were then introduced as witnesses the commissioner in chancery, designated for the purpose, and a citizen, both of whom witnessed the drawing for this *venire* as provided by Code, § 8-187; and the three jury commissioners appointed for 1951 and who made up the jury list from which this jury was drawn. One of the latter had lived in the county for 45 years and employed about 150 people, about 90% of whom were colored; two were life-long residents of the county. All testified to their oppor-

tunities for knowledge of and their wide acquaintance with the people of the county, both white and colored; all testified that they read the instructions given by the court and conscientiously endeavored to follow them; that a total of about 400 names was considered in making up the jury list of approximately 300; that the 40 or 50 colored persons on the list were chosen after considering 100 to 150 colored persons; and that no person was included in or excluded from the list because of race or color. There was evidence that there was a much larger proportion of whites than of Negroes who were qualified for jury service; that of 1352 criminal offenses dealt with by the trial justice in 1950, at least 90% involved colored persons; that from the June term, 1935, through the April, 1951, term of the circuit court, 703 indictments for felonies were returned, of which 629 involved colored persons and 74 involved white persons.

In the argument on the motion below, defendant's counsel stated he did not contend that the jury commissioners consciously discriminated against Negroes, and as the court remarked in passing on the motion, if they did not do so consciously, they could not have done so purposely or intentionally.

The issue raised by the motion, as the trial court stated, was whether there had been discrimination in the selection of the jury for the trial of this case. *Cassell* v. *Texas, supra.*

The burden was on the defendant to prove a purposeful and intentional discrimination. *Cassell* v. *Texas, supra; Fay* v. *New York,* 332 U. S. 261, 67 S. Ct. 1613, 91 L. ed. 2043; *Martin* v. *Texas,* 200 U. S. 316, 26 S. Ct. 338, 50 L. ed. 497.

Proof of prior discrimination long continued may establish a *prima facie* case, but the presumption created by such proof is not conclusive; it must needs give way to evidence which establishes the absence of discrimination in the case in judgment; otherwise there would be no way of ending the practice and no way of having a legal trial. The evidence here fully sustains the trial court's finding that there was no illegal discrimination and no constitutional defect in the selection of this jury.

Defendant complains that he was denied the right to show by cross-examination that white jury commissioners have acquaintance with and information about more white persons than colored persons qualified to serve as jurors. The answer to this is that the record does not show such denial. The basis for the complaint seems to be that on cross-examination the com-

missioner in chancery, who witnessed the drawings, was asked about his social relations with colored people. He referred to having attended a colored church and was then asked about the occasion, the time and the number present, whereupon the court said, "I do not think we can investigate every occasion of this nature and every person similarly situated;" that the issue was whether the witness was acquainted with the people of the county generally. Defendant was not denied the right to cross-examine by questions material to that issue. It is not necessary, of course, for jury commissioners to have social relations with those they select for jury service in order to perform their statutory duty of selecting "none but persons whom I believe to be of good repute for intelligence and honesty," in the effort "to promote only the impartial administration of justice." Code, § 8-181.

Defendant complains also that he was denied the right to test by cross-examination the opinion of one of the jury commissioners that there were more whites than Negroes in the county qualified for jury service. He was asked how he could arrive at such an opinion unless he knew how many people there were and who they were. The court sustained the objection to the form of the question as calling for numerical calculation. However, the examination continued without further objection to show that the statement was only opinion based on hearsay, and the ruling was in any event harmless. The jury commissioners were questioned at length about their opportunities of acquaintance with colored people through schools, churches, clubs and the like. The record shows that the court admitted all the evidence offered by the defendant in support of his motion, even testimony that could have been excluded as hearsay, and allowed defendant ample latitude for cross-examination. The motion to quash the *venire* was properly overruled.

Fourth. The assignments of error as to the sufficiency of the evidence and the motion to amend the indictment may be considered together.

The evidence for the Commonwealth on this trial did not differ materially from its evidence on the former trial. The same witnesses for the Commonwealth testified in both trials, with one exception later mentioned. Their testimony was stated in some detail in the former opinion, 191 Va. 510, 62 S. E. (2d)

28. The case for the Commonwealth on this trial, as the jury had the right to appraise the evidence, was this:

On the afternoon of the killing, Bailey drove in a truck to the garage of which Brockwell was service manager, parked his truck in the driveway, inquired for Brockwell, and went to the front where he was. He came back in a little while, moved his truck and again entered the garage. He and Brockwell made two trips to see the parts manager about the bill for the car of Bailey's father-in-law, which had been wrecked and left there for repairs. Bailey questioned the amount of the bill and was advised to leave the car until the insurance adjuster came the following Tuesday. As Brockwell and Bailey went back to the service department, Bailey remarked that he was "going to ride that night."

B. G. Brockwell, son of deceased, came in and Brockwell told him that the defendant was there to see about getting the car and requested the son to complete the bill. Young Brockwell added up the bill and told Bailey that the total was around $200. Bailey said there was insurance on the car and $50 was all that he was paying, and that he "was going to ride." He went on to tell young Brockwell how crooked they were; that "we were a bunch of white crooks," who had been putting most everything over on his father-in-law and that he was up there "getting things straightened out." Young Brockwell offered to take out a new battery that had been installed, but that did not satisfy the defendant, who kept "mumbling." They went back to Brockwell's desk and the latter told Bailey to bring his father-in-law down the following Tuesday when the insurance man would be there and "we will get it all straightened out then." Defendant then threw a check down on the desk and said, "I am riding today, this is all I am paying." Brockwell handed the check back to him and told him "to go ahead and come back Tuesday with his father-in-law." Defendant walked off and the boy with him was trying to get him to go on out.

B. G. Brockwell thought he had gone out, but as he and the parts manager were busy a few feet from Brockwell's desk, they heard a scuffle. On looking around, young Brockwell saw his father's hands up in the air and saw the defendant strike him. In the meantime a truck had been placed in the doorway to the service department so that its front was about five feet from Brockwell's desk and its side about three feet from the west wall.

From the desk to the doorway was 26 feet and the truck was 21 feet long. Brockwell was shoving the defendant toward the door in the space between the truck and the wall. Young Brockwell ran around on the other side, and as his father and defendant came out the door, he jumped between them. Bailey struck at him and he struck at Bailey while his father went back to his desk and sat down.

The defendant then went on across the street and was seen to lay an open knife in the palm of his hand and put it into his pocket.

Brockwell died in a few minutes from a stab wound in his heart, in addition to which there was a stab wound in his left side and a cut on his belt five or six inches long, as well as an abrasion on his chest.

There was other evidence that Brockwell did not touch defendant until after the defendant had struck him and then only to take hold of defendant's shoulders and shake him. Two witnesses were standing by Brockwell's desk. Their testimony was that defendant came back in front of the truck and began talking, saying there was nothing but a bunch of crooks working there and that he was going to ride tonight anyway. He refused to be quiet. Brockwell, then seated at his desk at work, told him to leave. He then got up from his desk and went to put Bailey out. The witnesses at the desk could then see Bailey's hands moving while Brockwell's hands were up. Nobody saw the knife in Bailey's hand as Bailey backed out of the door about two steps ahead of Brockwell.

Defendant's version differed materially from that given at his first trial. He then testified that Brockwell hit him on the back of the neck, that he fell and then Brockwell kicked him in the groin; that he took his knife out while Brockwell was behind him beating him.

On this trial he said that when he came out of the door to go to his parked truck he was saying to himself that it looked like there was a trick in it; that this fellow spoke and as he turned around to see who it was, "that is when he hit me, and I scrambled and got on out and he followed me. * * and was beating on me, and we got out to the street * *. That is when he grabbed me on the shoulder and pulled me around and hit me again." He said he did not even know whether he cut the man or not; that he was excited and scared and "I just couldn't

exactly tell you why I did it, or when I used it, and all that.'' He was asked when he got his knife out and said that was what he couldn't understand, that he was ''bound to have been scared, or excited or something, because I just couldn't understand why I got my knife out.''

When he was arrested a few minutes after the killing, he denied having a knife and denied cutting Brockwell. The next day he claimed he did not own a knife and did not have one, and that he had not cut anybody.

Except for the defendant's testimony, which the jury had a right to reject, the Commonwealth's witnesses were not contradicted except in one particular. Thomas Turner, a witness called by the Commonwealth at the first trial but on this trial called by the court subject to cross-examination by both sides, testified that as Bailey stood in front of the truck he kept saying he had come for his car and was going to have it that day, and that the outfit was a bunch of crooks; that Brockwell got up from his desk and started fighting him; that Brockwell struck the first blow and they were fighting between the truck and the wall all the way until they got outside.

This conflict, of course, was for the jury to settle. There was evidence that three days after the killing Turner told the chief of police that he did not see Brockwell strike the defendant at any time.

On this evidence we hold, as we did on the evidence in the first trial, and for the reasons there stated, 191 Va. at p. 516, 62 S. E. (2d) at p. 30, that whether Bailey was guilty of murder in the first degree was a question for the jury and their verdict we are not at liberty to disturb. As we there said, the repeated statements of the defendant that he intended to ride regardless, his repeated insults which the jury could believe were for the purpose of provoking difficulty, his persistent refusal to leave the premises when urged by his friend and requested by the deceased, his quick and unnecessary resort to a deadly weapon to resist being ejected in a reasonable manner, and his readiness to inflict death, combine to make it a question of fact for the jury whether there was any excuse or provocation for the killing, or provocation so slight as not to amount to extenuating circumstances.

In this view it was, of course, proper for the court to

deny the motion to amend the indictment to charge only manslaughter.

Fifth. The defendant assigns error to these rulings on instructions:

1. The giving of Instruction 6 for the Commonwealth "that a mortal wound given with a deadly weapon in the previous possession of the slayer, without any provocation or even with slight provocation, is *prima facie* wilful, deliberate and premeditated killing, and throws upon the accused the necessity of showing extenuating circumstances." As we said in the former opinion, *Bailey* v. *Commonwealth,* 191 Va. 510, 517, 62 S. E. (2d) 28, 31, that is an established principle of our criminal law. *Scott* v. *Commonwealth,* 143 Va. 510, 518, 129 S. E. 360, 363. It was approved as recently as *Thomas* v. *Commonwealth,* 186 Va. 131, 137-8, 41 S. E. (2d) 476, 479. It has been found to be neither unfair nor illogical in a long series of criminal trials. We see no reason to repudiate it now.

2. The refusal of Instruction L offered by defendant, which would have told the jury that if Brockwell and Bailey were sufficiently close together to have been fighting in front of the truck and, whether they were fighting or not, if Bailey attempted to flee from in front of the truck and to leave the premises, he was not guilty of murder unless he cut Brockwell before attempting to flee. This could have meant to the jury that if Bailey stabbed Brockwell while they were between the truck and the wall just because Brockwell was following him, he was not guilty of murder. It was properly refused.

3. The refusal of Instruction M: "The court instructs the jury that if at the time of the homicide the prisoner's state of mind caused by passion, anger, or rage, was such that a reasonable doubt could exist as to his having acted deliberately and with premeditation, they cannot find him guilty of murder in the first degree." A sufficient reason for its refusal could have been the absence of evidence of such a state of mind. The defendant's excuse for wielding the knife was excitement and fright. Furthermore, if the principle sought to be stated were sound, it was not correctly stated. The test would be not whether a reasonable doubt could exist, but whether the jury believed from this evidence that it did exist. But the instruction was too broad. Anger does not necessarily preclude premeditation. The person lying in wait to kill is probably angry at his

victim. When he fires his shot his anger may be such that he was not at that moment deliberating. But if previous anger caused him to premeditate the killing, his act is still murder. A killing in anger without provocation or upon very slight provocation may still be murder in the first degree. *Jacobs* v. *Commonwealth*, 132 Va. 681, 111 S. E. 90; *Scott* v. *Commonwealth*, 143 Va. 510, 129 S. E. 360.

Sixth. The Commonwealth's attorney argued to the jury that after leaving, the defendant came back and, "How did he come back? He came back with the avowed purpose of riding tonight regardless. He came back with his hands in his pocket and his knife in his pocket open." The defendant objected and moved for a mistrial on the ground that there was no evidence "as to what Bailey had in his pocket when he returned that second time." His motion was overruled and he says that was error.

On his direct examination Bailey was asked about the knife and the record shows this:

"A. Oh, when he jumped on me well I didn't have the knife right then.

Q. Where was the knife?

A. The knife was in my pocket.

Q. What kind of knife was it?

A. A small knife, a pocketknife.

Q. Was the blade open or shut?

A. Opened one end.

Q. What I mean is how many blades to it?

A. Two.

Q. Both blades open from the same end?

A. That is right."

The Commonwealth's attorney had the right to argue the evdence and the fair inferences from it. Here there were evidence and inferences from evidence to warrant the argument. *Cf. Sims* v. *Commonwealth*, 134 Va. 736, 115 S. E. 382; *Scott* v. *Commonwealth, supra.*

We find no prejudicial error in the trial and the judgment below is accordingly

*Affirmed.*